FILED
United States Court of Appeals
Tenth Circuit

December 10, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENK CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JEREMIAH WEST,

Defendant - Appellant.

No. 06-4284

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:05-CR-675-DAK)**

Submitted on the briefs:[*]

James A. Valdez of James A. Valdez, LLC, Salt Lake City, Utah, for
Defendant-Appellant Jeremiah West.

Brett L. Tolman, United States Attorney, and Karin M. Fojtik, Assistant United
States Attorney, Salt Lake City, Utah, for Plaintiff-Appellee United States of
America.

---

[*] After examining the briefs and appellate record, this panel has
determined unanimously to honor the parties' request for a decision on the briefs
without oral argument. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The
case is therefore ordered submitted without oral argument.

Before **BRISCOE, EBEL** and **McCONNELL**, Circuit Judges.

**EBEL**, Circuit Judge.

Defendant-Appellant Jeremiah West received a 235-month sentence for his conviction for being a previously-convicted felon in possession of a firearm. On appeal, he challenges that sentence, primarily on two grounds. First, West argues that the district court erred in concluding that he was subject to a mandatory minimum fifteen-year sentence under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). To resolve this issue, we apply the Supreme Court's recent decision in Begay v. United States, 128 S. Ct. 1581 (2008), and affirm the district court's determination.

Second, West argues that in calculating his advisory guideline range under the sentencing guidelines, the district court erred in applying three enhancements that increased his offense level by twelve. Although the presentence report ("PSR") contained facts supporting the application of these three enhancements, West adequately disputed those facts at sentencing. Thus, the district court was obligated, under Fed. R. Crim. P. 32(i)(3)(B), either to rule on those disputes or explain why the disputed facts were not relevant to sentencing West. Because the court failed to meet its Rule 32(i)(3)(B) fact-finding obligation, we remand for further proceedings.

## I. Background

On August 9, 2005, West stopped his car at a gas station in Lehi, Utah. During the stop, a woman accompanying West told the gas station owner that she was being kidnapped. The owner called police.

When officers arrived, they used their cars to block West's vehicle and prevent him from leaving. As the officers tried to question him, West put his car into reverse and quickly backed up, hitting the building. West then drove his car forward and ran into one of the police cars blocking his path. He continued to alternate driving his car forward and back, repeatedly hitting both the building and the police vehicles blocking his escape. West also floored the accelerator and attempted to use his car to shove one of the police cars out of his way. West continued these efforts to escape until one of the officers drew his weapon and pointed it at West. Even as officers attempted to restrain him physically, West continued to resist.

After arresting West, officers found a fully loaded 12-gauge shotgun in the car, between the driver's seat and the center console. Officers also found a baggie of methamphetamine in the car, and a large bag of marijuana hidden between the car's coolant reservoir and the engine firewall.

The United States indicted West on four counts: (1) being a previously convicted felon in possession of a firearm and ammunition, (2) being a person who is addicted to, and an unlawful user of, controlled substances, who

knowingly possesses a firearm and ammunition, (3) possessing marijuana with the intent to distribute it, and (4) possessing methamphetamine. In exchange for the Government's agreement to drop the other three charges, West pled guilty to one count of being a previously convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).[1] In pleading guilty to this charge, West admitted, among other things, that he had tried to evade police, he knowingly possessed the shotgun found in his car, and he had previously been convicted of a felony.

West faced up to ten years in prison on the felon-in-possession conviction. See 18 U.S.C. § 924(a)(2). But before he entered his guilty plea, the Government notified West that it would seek to enhance that sentence under the ACCA. At sentencing, the district court determined that West qualified as an armed career criminal under the ACCA, 18 U.S.C. § 924(e). As such, he faced a statutory

---

[1]Section 922(g)(1) makes it

unlawful for any person —

(1) who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year []

    . . . .

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1).

4

mandatory minimum fifteen-year, or 180-month, sentence.  See id. § 924(e)(1).[2]

Moreover, the PSR calculated West's offense level to be 33 and his criminal

history category to be VI, resulting in an advisory guideline imprisonment range

of between 235 and 293 months.  The district court imposed a sentence at the

lowest end of that range, 235 months.  West appeals, challenging that sentence.

We have jurisdiction to consider this appeal under 18 U.S.C. § 3742 and 28

U.S.C. § 1291.

## II.  Discussion

**A.      Whether West qualifies as an armed career offender under the ACCA**

West challenges the district court's conclusion that his prior convictions

make him an armed career offender under the ACCA.  A defendant convicted of

violating 18 U.S.C. § 922(g) qualifies as an armed career offender if he "has three

previous convictions by any court referred to in section 922(g)(1) of this title for

a violent felony or a serious drug offense, or both, committed on occasions

---

[2]Section 924(e)(1) provides that,

> [i]n the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g).

18 U.S.C. § 924(e).

5

different from one another." 18 U.S.C. § 924(e)(1); see also James v. United States, 550 U.S. 192, 127 S. Ct. 1586, 1590-91 (2007). In this case, the district court determined that West had three qualifying convictions: 1) a 1999 Utah felony conviction for engaging in a criminal enterprise; 2) a 2000 Utah felony conviction for burglary of a dwelling; and 3) a 2001 Utah felony conviction for failing to stop at a police officer's command. On appeal, West argues that neither the criminal-enterprise nor the failure-to-stop conviction is sufficient to qualify him as an armed career criminal.

To the extent that West faults the district court for failing to find the factual existence of these predicate convictions by a preponderance of the evidence, we reject that argument. The PSR set forth facts establishing the existence of these prior convictions, as well as the details underlying them. And in the district court, West never challenged the PSR on this basis. "Criminal Procedure Rule 32 requires the defendant to affirmatively point out any fact in the PSR that he contends is inaccurate. Absent an objection to the PSR, the district court 'may accept any undisputed portion of the presentence report as a finding of fact.' Fed. R. Crim. P. 32(i)(3)(A)." United States v. Harris, 447 F.3d 1300, 1306 (10th Cir. 2006); see also United States v. Avalos, 506 F.3d 972, 979-80 (10th Cir. 2007) (noting that "a defendant must make a showing that the information in the PSR is unreliable and articulate the reasons why the facts contained therein are untrue or inaccurate" (quotation marks, alterations

6

omitted)), petition for cert. filed, (U.S. Mar. 21, 2008) (No. 07-10063).[3]  In this case, West circumvented any need for the Government to present additional evidence during the sentencing proceeding in support of the factual existence of these prior convictions by failing to object to the information regarding these convictions already contained in the PSR.  See Chee, 514 F.3d at 1115; United States v. Overholt, 307 F.3d 1231, 1251-52 (10th Cir. 2002); United States v. Kay, 961 F.2d 1505, 1507 (10th Cir. 1992).

On appeal, West can still argue that these convictions, as a matter of law,

[3]In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Id. at 244.  In this Sixth Amendment context, we have held that a defendant's failure to object to facts in the PSR does not result in a waiver of his constitutional right to have sentencing enhancements proved to a jury beyond a reasonable doubt.  See United States v. Bass, 411 F.3d 1198, 1204 n.7 (10th Cir. 2005); see also United States v. Wolfe, 435 F.3d 1289, 1299 (10th Cir. 2006).  But in this case, West makes no Sixth Amendment Booker argument. And the district court treated the sentencing guidelines as advisory, thus curing any systemic constitutional defect with sentencing under the federal guidelines. See Booker, 543 U.S. at 245.  In any event, Booker expressly exempts the factual question here—whether West actually has these prior convictions—from the Sixth Amendment's requirement that a jury find any fact that increases a sentence beyond the maximum authorized by a guilty plea or jury verdict.  See id. at 244; see also James, 127 S. Ct. at 1600 n.8.

Outside the Sixth Amendment Booker context, Fed. R. Crim. P. 32 continues to require a defendant, at or before sentencing, to make specific objections to facts contained in the PSR.  See Harris, 447 F.3d at 1306; Wolfe, 435 F.3d at 1299.  If a defendant fails to make such an objection, we will deem him to have waived any dispute regarding the facts set forth in the PSR.  See Harris, 447 F.3d at 1306; Wolfe, 435 F.3d at 1299; see also United States v. Chee, 514 F.3d 1106, 1114-15 (10th Cir. 2008); Avalos, 506 F.3d at 979-80.

7

fail to qualify him as an armed career criminal. See United States v. Fell, 511 F.3d 1035, 1037 (10th Cir. 2007). In addressing that argument and determining whether a prior conviction falls under the ACCA, we apply a "categorical approach," generally looking "only to the fact of conviction and the statutory definition of the prior offense, and do not generally consider the particular facts disclosed by the record of conviction." James, 127 S. Ct. at 1593-94 (quotation omitted). "That is, we consider whether the elements of the offense are of the type that would justify its inclusion" within the ACCA, "without inquiring into the specific conduct of this particular offender." Id. at 1594. To satisfy this categorical approach, it is not necessary "that every conceivable factual offense covered by a statute" fall within the ACCA. Id. at 1597. "Rather, the proper inquiry is whether the conduct encompassed by the elements of the offense, in the ordinary case," qualifies under the ACCA as a violent felony or a serious drug offense. Id.; see also Fell, 511 F.3d at 1039-40.

If, in the ordinary case, a criminal statute proscribes conduct broader than that which would satisfy the ACCA's definition of a violent felony or serious drug offense, a federal court may then also look at the charging documents and documents of conviction to determine whether the defendant in a particular case was convicted of an offense that falls within the ACCA. See Shepard v. United States, 544 U.S. 13, 15-18, 20-21 (2005); Taylor v. United States, 495 U.S. 575, 577-78, 598-602 (1990). We have referred to this as a "modified categorical"

8

approach.  See United States v. Zuniga-Soto, 527 F.3d 1110, 1119-20 (10th Cir. 2008).

As previously stated, West does not challenge the district court's conclusion that his prior burglary conviction qualifies as a violent felony under the ACCA.  But he does dispute that his prior convictions for engaging in a criminal enterprise and for failing to stop at an officer's command fall within the ACCA.

### 1.    West's Utah felony conviction for a criminal enterprise

The PSR indicated that, in January 1999, West pled guilty to engaging in a criminal enterprise, a second-degree felony under Utah law.  The PSR further indicated that, according to "[c]ourt documents," that conviction resulted after police stopped a car West was driving and found in the car "a jewelry box containing two empty bags . . . and three one-gram baggies of methamphetamine." The "[c]ourt documents" further indicated that West "admitted ownership of the drugs, and he told the officer that he had been using and selling methamphetamine."

In this appeal, West argues that his criminal-enterprise conviction does not qualify as a serious drug offense.  West has waived that argument, however, by affirmatively conceding in the district court that this conviction was a predicate offense for ACCA purposes.  During a hearing on West's motion to withdraw his guilty plea, defense counsel expressly "concede[d]" that both West's prior

convictions for burglary and criminal enterprise "would be predicate offenses for armed career offender." Consistent with that concession, West, in his first two sentencing memoranda filed with the district court, did not object to the PSR characterization of his Utah criminal-enterprise conviction as a "serious drug offense" under the ACCA. And in his third sentencing memorandum filed with the district court, West again conceded that his burglary and criminal-enterprise convictions are "two convictions that qualify" under 18 U.S.C. § 924(e).[4] In that memorandum, he instead specifically argued that his two <u>other</u> prior convictions should not count under the ACCA. Later in the same memorandum, West asserted again that he has "only three possible predicate offenses for consideration of sentence as ACCA sentence. Criminal Enterprise, Burglary and Failure to respond, the latter of which should not be considered." Finally, even during the sentencing hearing, defense counsel argued only that West's Utah conviction for fleeing police should not be counted as a violent felony for ACCA purposes.

_____

[4]In making this concession, West acknowledged that he "has two convictions that qualify under those definitions [of ACCA predicate offenses], Criminal Enterprise which is questionable because of the name of the charge and Burglary. Both of those carry a sentence of one to fifteen and one year respectively." We do not deem West's reference to his criminal-enterprise conviction, as being "questionable because of the name of the charge," to be sufficient to raise the issue of whether this conviction qualifies as a predicate offense under the ACCA. Our interpretation is bolstered by the fact that this phrase, "questionable because of the name of the charge," is included in a sentence that otherwise concedes that the criminal-enterprise conviction <u>does</u> qualify as a predicate offense under the ACCA.

10

In light of these affirmative concessions before the district court, West has waived his appellate argument that his Utah criminal-enterprise conviction does not qualify as a serious drug offense under the ACCA.

> "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" United States v. Olano, 507 U.S. 725, 733 . . . (1993). In other words, waiver is accomplished by intent, but forfeiture comes about through neglect. Given this distinction, we have held that a party that has forfeited a right by failing to make a proper objection may obtain relief for plain error; but a party that has waived a right is not entitled to appellate relief.

United States v. Carrasco-Salazar, 494 F.3d 1270, 1272 (10th Cir. 2007) (citations, further quotation, alterations omitted); see United States v. Cordova-Arevalo, 456 F.3d 1229, 1231 n.4 (10th Cir. 2006) (holding that the defendant conceded that his prior Colorado conviction for third-degree assault was a violent felony, for purposes of U.S.S.G. § 2L1.2, where defendant never challenged the PSR's treatment of that conviction as a violent felony under § 2L1.2, but instead affirmatively acknowledged that it met § 2L1.2's definition of a felony); cf. United States v. Mancera-Perez, 505 F.3d 1054, 1056-59 (10th Cir. 2007) (holding that defendant who, at sentencing, did not argue for a lower sentence and, instead, affirmatively conceded that a sentence at the lowest end of the advisory guideline range was appropriate, had waived his appellate argument challenging the substantive reasonableness of that sentence), cert. denied, 128 S. Ct. 1314 (2008).

11

## 2. West's Utah conviction for failing to stop at an officer's command

Next, West challenges the district court's determination that his 2001 Utah conviction for failing to stop at a police officer's command was a violent felony for ACCA purposes. Regarding this conviction, the PSR indicates that,

> [o]n June 13, 1997, an officer of the American Fork Police Department observed [West] speeding. The officer attempted to make a traffic stop; however, [West] accelerated through city streets, running a stop sign, then spun out of control across a yard and through several mailboxes. He continued to speed and run stop signs until the officer was finally able to locate the car. The car's owner identified [West] as the driver. [West's] license was suspended, and several stolen items were located in the vehicle.

(R. v. VI (PSR) para. 31.) As a result of this incident, West pled guilty, in 2001, to failing to stop at an officer's command. He was represented by counsel at the time.

During the sentencing proceeding that occurred in the federal criminal prosecution at issue here, the district court, over West's objection, concluded that the earlier Utah conviction for failing to stop at an officer's command qualifies as a "violent felony" under the ACCA. We review that legal determination de novo. See Fell, 511 F.3d at 1037.

> The ACCA, in pertinent part, defines a violent felony as
>
> any crime punishable by imprisonment for a term exceeding one year . . . that—
>
> > (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

12

(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B).

The parties do not dispute that failing to stop at an officer's command is an offense punishable under Utah law for a term of imprisonment exceeding one year. The Government then asserts that such a conviction falls within the ACCA's residual language because it "otherwise involves conduct that presents a serious potential risk of physical injury to another." Id. § 924(e)(2)(B)(ii).

Applying the Supreme Court's decision in Begay v. United States, 128 S. Ct. 1581 (2008), we conclude that, under a categorical approach, a prior conviction under Utah law for failing to stop at an officer's command qualifies as a violent felony under the ACCA's residual language.

### a. Applying Begay

In determining whether a prior conviction qualifies as a violent felony under the ACCA's residual provision, Begay requires a two-part inquiry, considering both (1) whether the offense of conviction "presents a serious potential risk of physical injury to another," 18 U.S.C. § 924(e)(2)(B)(ii); and (2) whether the offense is "roughly similar, in kind as well as in degree of risk posed, to the" offenses specifically enumerated in § 924(e)(2)(B)(ii)—burglary, arson, extortion, or crimes involving explosives. Begay, 128 S. Ct. at 1585; see

13

United States v. Mayer, 530 F.3d 1099, 1109 (9th Cir. 2008); see also United States v. Smith, 544 F.3d 781, 783-84 (7th Cir. 2008); United States v. Gray, 535 F.3d 128, 130-31 (2d Cir. 2008) (applying Begay to determine if prior convictions were crimes of violence for purposes of U.S.S.G. § 4B1.2); United States v. Archer, 531 F.3d 1347, 1350 (11th Cir. 2008) (same); United States v. Williams, 529 F.3d 1, 2, 5-8 (1st Cir. 2008) (same); United States v. Papakee, 550 F. Supp. 2d 991, 999, 1002 (N.D. Iowa 2008) (same).[5]  In addressing these dual inquiries, we apply a "categorical approach," generally looking "only to the fact of conviction and the statutory definition of the prior offense, and do not generally consider the particular facts disclosed by the record of conviction." James, 127 S. Ct. at 1593-94 (quotation omitted); see Gray, 535 F.3d at 131 (applying Begay using categorical approach); Archer, 531 F.3d at 1350 (same).  If need be, however, we will apply the modified categorical approach when, for example, the statute of conviction applies to a broader range of conduct than would fit within the ACCA's residual language.  See Shepard, 544 U.S. at 15-18, 20-21; Taylor,

---

[5]Because of the similarity in language between 18 U.S.C. § 924(e)(2)(B) and U.S.S.G. § 4B1.2(a), this court has occasionally looked to precedent under one of these provisions as guidance under the other provision in determining whether a conviction qualifies as a crime of violence.  See United States v. Tiger, 538 F.3d 1297, 1297-98 (10th Cir. 2008); United States v. Moyer, 282 F.3d 1311, 1315 n.2 (10th Cir. 2002); see also United States v. Karam, 496 F.3d 1157, 1166-67 (10th Cir. 2007); United States v. Rowland, 357 F.3d 1193, 1195 (10th Cir. 2004); United States v. Lucio-Lucio, 347 F.3d 1202, 1206 n.6 (10th Cir. 2003); cf. United States v. Springfield, 196 F.3d 1180, 1185 (10th Cir. 1999). Further, we have previously applied Begay to U.S.S.G. § 4B1.2.  See Tiger, 538 F.3d at 1298.

495 U.S. at 577-78, 598-602.

i. **Whether a Utah conviction for failing to stop at an officer's command presents a serious potential risk of physical injury to another**

Utah defines the offense of failing to stop at an officer's command as follows:

> [a]n operator who receives a visual or audible signal from a peace officer to bring the vehicle to a stop may not:
>
> > (i) operate the vehicle in willful or wanton disregard of the signal so as to interfere with or endanger the operation of any vehicle or person; or
>
> > (ii) attempt to flee or elude a peace officer by vehicle or other means.

Utah Code § 41-6a-210(1)(a).[6]

---

[6]This statute was previously enumerated as Utah Code § 41-6-13.5(1). <u>See</u> <u>State v. Simpson</u>, 904 P.2d 709, 712 (Utah Ct. App. 1995). Effective February 2005, however, that section was renumbered as Utah Code § 41-6a-210. While the language of the earlier statute was the same as that of the current statute, the earlier statute was not broken into two separate sections, as the statute is now. <u>See</u> <u>id.</u>

Addressing the prior version of this statute, the Utah Court of Appeals held that,

> [t]o be guilty of this offense, a driver must first willfully or wantonly disregard an officer's visual or audible signal to stop the vehicle. The crime is then completed in one of two ways: Either (1) the driver operates his vehicle in a way that interferes with the operation of any other vehicle or endangers any person or vehicle, <u>or</u> (2) the driver attempts to flee or elude the officer. Accordingly, a violation of section 41-6-13.5 could be characterized either as "failing to respond to a peace officer's signal to stop" or as "fleeing or eluding a peace officer."

(continued...)

15

Although this court has not yet addressed whether a conviction under this statute, or similar statutes, poses a serious potential risk of physical injury to another, other circuits have considered the question. From these cases "[a] consensus has emerged that evasive driving offenses . . . constitute a category of 'violent' crime within the meaning of the ACCA's provision for 'conduct that presents a serious potential risk of physical injury to another.'"[7] Powell v. United States, 430 F.3d 490, 491-92 (1st Cir. 2005) (per curiam) (quoting 18 U.S.C. § 924(e)(2)(B)(ii) (footnote omitted)) (holding that conviction for eluding police, under Maine statute which provides that "[w]hoever, after being requested or signaled to stop, attempts to elude a law enforcement officer by driving a vehicle at a reckless rate of speed which results in a high-speed chase between the operator's vehicle and any law enforcement vehicle using a blue light and siren is guilty" of a felony-level crime, involves conduct that presents a serious potential

---

[6](...continued)
Simpson, 904 P.2d at 712. Utah courts have not addressed the elements of this offense under the current statute. But Simpson's interpretation of the earlier statute no longer appears accurate in light of the subsequent legislative revision, breaking this statute into two separate provisions and relegating the "willful or wanton" language only to the first of those sections.

[7]Because these cases pre-date Begay, they considered only whether the prior conviction presented a serious potential risk of injury to another, and did not further consider whether the prior conviction was for an offense roughly similar in kind, as well as degree of risk posed, by the offenses enumerated in § 924(e)(2)(B)(ii), before concluding that the offense qualified as a violent felony under the ACCA. See Powell v. United States, 430 F.3d 490, 491-92 (1st Cir. 2005) (per curiam).

16

risk of physical injury to another for purposes of 18 U.S.C. § 924(e) (quotation omitted)); see United States v. Orisnord, 483 F.3d 1169, 1182 (11th Cir.) (holding conviction under Florida statute applying to one who "willfully flees or attempts to elude a law enforcement officer . . . and during the course of the fleeing or attempted eluding . . . drives at high speed, or in any manner which demonstrates a wanton disregard for the safety of persons or property," presents a serious potential risk for the physical injury of another for purposes of U.S.S.G. § 4B1.2 (quotation, alteration omitted)), cert. denied, 128 S. Ct. 673 (2007); United States v. Kendrick, 423 F.3d 803, 809-10 (8th Cir. 2005) (holding that Oregon conviction for fleeing or eluding police, under statute which provides that "[a] person commits the crime of fleeing or attempting to elude a police officer if, while operating a motor vehicle, he knowingly flees or attempts to elude an identifiable police officer after the officer has just given a visual or audible signal to stop," involves conduct that presents a serious potential risk of physical injury to another for purposes of U.S.S.G. § 4B1.2 (quotation omitted)); United States v. Howze, 343 F.3d 919, 921-22 (7th Cir. 2003) (holding conviction for fleeing from an officer, in violation of a Wisconsin statute providing that "[n]o operator of a vehicle, after having received a visual or audible signal from a traffic officer, or marked police vehicle, shall knowingly flee or attempt to elude any traffic officer by willful or wanton disregard of such signal so as to interfere with or endanger the operation of the police vehicle, or the traffic officer or other vehicles or

17

pedestrians, nor shall the operator increase the speed of the operator's vehicle or extinguish the lights of the vehicle in an attempt to elude or flee," presents a serious potential risk of physical injury to another for purposes of 18 U.S.C. § 924(e) (quotation omitted)); United States v. James, 337 F.3d 387, 389-91 (4th Cir. 2003) (holding conviction under South Carolina law for "failure to stop for a blue light," which requires proof "(1) that the defendant was driving a motor vehicle; (2) that he was driving it on a road, street, or highway of the State; (3) that he was signaled to stop by a law enforcement vehicle by means of a siren or flashing light; and (4) that he did not stop," presents a serious potential risk of physical injury to another for purposes of 18 U.S.C. § 924(e)); see also United States v. Rosas, 410 F.3d 332, 334-35 (7th Cir. 2005) (per curiam) (following Howze and concluding that a Wisconsin conviction for "fleeing a police officer" presents a serious potential risk of physical injury to another for purposes of U.S.S.G. § 4B1.2(a)).[8] We agree with the reasoning of these courts. Although

_____

[8]These circuits each applied a categorical approach to reach this conclusion. Other courts, applying different statutes, have instead applied a modified categorical approach and, thus, also considered the relevant charging and conviction documents to determine if a prior conviction for fleeing or eluding police presents a serious potential risk of physical injury to another. See United States v. Foreman, 436 F.3d 638, 640-43 (6th Cir. 2006) (holding modified categorical approach must be applied to determine if Michigan fourth-degree felony conviction for fleeing and eluding, in a particular case, presented a serious potential risk of physical injury to another; the Michigan statute at issue provided that "[a] driver of a motor vehicle who is given by hand, voice, emergency light, or siren a visual or audible signal by a police or conservation officer, acting in the lawful performance of his or her duty, directing the driver to bring his or her

(continued...)

18

the statutes at issue in these cases are not all identical to the Utah statute at issue

here, they are sufficiently similar to support our conclusion that a Utah conviction

under Utah Code § 41-6a-210(1)(a) for failing to stop at an officer's command, in

the ordinary case, presents a serious potential risk of physical injury to another.

Many of these decisions from other circuits draw analogies between

---

[8](...continued)
motor vehicle to a stop shall not willfully fail to obey that direction by increasing the speed of the vehicle, extinguishing the lights of the vehicle, or otherwise attempting to flee or elude the police or conservation officer. This subsection does not apply unless the police or conservation officer giving the signal is in uniform and the officer's vehicle is identified as an official police or department of natural resources vehicle."); United States v. Kelly, 422 F.3d 889, 891, 893-96 (9th Cir. 2005) (holding modified categorical approach was required to determine whether prior conviction under Washington's statute, criminalizing "a wanton and willful disregard for the lives or property of others while attempting to elude a pursuing police vehicle," was a crime of violence under U.S.S.G. § 4B1.2); United States v. Martin, 378 F.3d 578, 581-84 (6th Cir. 2004) (applying modified categorical approach to determine whether prior conviction under Michigan's third-degree fleeing and eluding statute presents a serious potential risk of physical injury to another; the statute at issue provided that "a driver of a motor vehicle who is given . . . a signal by an officer . . . directing the driver to . . . stop shall not willfully fail to obey that direction by increasing the speed of the vehicle, extinguishing the lights of the vehicle, or otherwise attempting to flee or elude the . . . officer," and that a third-degree offense occurs when such violation "results in a collision or accident, if the violation occurred in an area where the speed limit is 35 miles an hour or less or if the defendant has a previous conviction for actual or attempted fourth-degree fleeing or eluding or similar misconduct") (quotations omitted)); see also United States v. Jennings, 515 F.3d 980, 989-90 n.9 (9th Cir. 2008) (reaffirming Kelly's treatment of Washington's eluding statute). These cases generally considered broader statutes that permit a conviction for eluding police not only when a defendant's conduct might pose a serious potential risk for physical injury to another, but also when a defendant instead caused property damage, see Kelly, 422 F.3d at 891; or instead when an aggravated conviction may be based upon the fact that the defendant had a previous conviction for similar conduct, see Martin, 378 F.3d at 581-84.

convictions for eluding police and convictions for escape from police custody or jail, which courts have also treated as presenting a serious potential risk of physical injury to another. See Kendrick, 423 F.3d at 809; Howze, 343 F.3d at 921-22; James, 337 F.3d at 391 n.4. The analogy is apt. Like those circuits, we, too, have recognized that

> every escape scenario is a powder keg, which may or may not explode into violence and result in physical injury to someone at any given time, but which always has the serious potential to do so. A defendant who escapes from a jail is likely to possess a variety of supercharged emotions, and in evading those trying to recapture him, may feel threatened by police officers, ordinary citizens, or even fellow escapees. Consequently, violence could erupt at any time. Indeed, even in a case where a defendant escapes from a jail by stealth and injures no one in the process, there is still a serious potential risk that injury will result when officers find the defendant and attempt to place him in custody.

United States v. Gosling, 39 F.3d 1140, 1141, 1142 (10th Cir. 1994) (citations omitted) (addressing whether escape presents a serious potential risk of physical injury to another for purposes of U.S.S.G. § 4B1.2); see also Avalos, 506 F.3d at 980; Springfield, 196 F.3d at 1185 (noting Tenth Circuit has "held categorically that an escape always constitutes conduct that presents a serious potential risk of physical injury to another, for the purpose of the ACCA as well as for the career offender provisions of the sentencing guidelines" (quotation, alterations omitted)).

"Thus, under the ACCA and the United States Sentencing Guidelines, escape is always a violent crime. It is irrelevant whether the escape actually

20

involved any violence or whether defendant was convicted under a state statute that defines escape as a nonviolent offense." Springfield, 196 F.3d at 1185 (holding conviction for "walkaway" escape presents a serious potential risk of physical injury to another for purposes of 18 U.S.C. § 924(e)); see also United States v. Patterson, 472 F.3d 767, 783 (10th Cir. 2006), petition for cert. filed, (U.S. Apr. 24, 2007) (No. 06-10972); United States v. Small, 423 F.3d 1164, 1188 n.13 (10th Cir. 2005).[9]

The same reasoning supports a conclusion here that prior convictions for

---

[9]We do not read Begay to have called into question our prior Tenth Circuit precedent concluding that escape presents a serious potential risk of physical injury to another for purposes of the ACCA. In fact, this court has continued to rely upon this precedent even after Begay. See United States v. Ellis, 525 F.3d 960, 965 (10th Cir. 2008) (relying on Tenth Circuit precedent holding escape is a violent felony, after Begay, but not specifically discussing Begay), cert. denied, 129 S. Ct. 318 (2008). We recognize that the Supreme Court has granted a writ of certiorari to decide whether an escape conviction should be deemed a violent felony under the ACCA. See Chambers v. United States, 128 S. Ct. 2046 (2008) (granting certiorari); see also Chambers v. United States, No. 06-11206, 2007 WL 5117449 (May 8, 2007) (petition for certiorari presenting the question of "[w]hether a defendant's failure to report for confinement 'involves conduct that presents a serious potential risk of physical injury to another' such that a conviction for escape based on that failure to report is a 'violent felony' within the meaning of the Armed Career Criminal Act, 18 U.S.C. § 924(e)"). But, at least for the time being, we must continue to apply our prior precedent.

Even if the Supreme Court concludes that an escape conviction does not categorically present a serious potential risk of physical injury to another, we would conclude that a Utah conviction for failing to obey an officer's command would categorically present a serious potential risk of physical injury to another. Such a conviction under Utah law will always involve the use of a motor vehicle. It will always involve an overt, rather than covert, disobedience of an officer's command and will occur directly in the officer's presence. And it will likely occur in the presence of innocent and unsuspecting bystanders.

21

eluding or evading police, at least when they involve a vehicle, should also categorically be deemed to present a serious potential risk of physical injury to another. "There is little doubt that felony fleeing involves, at the very least, the same risks of physical injury to another as a walk-away escape." Kendrick, 423 F.3d at 809.

> Flight to avoid apprehension is one means through which the risk of escape may be realized. When the crime is flight to avoid apprehension, what is only a risk for escape becomes a certainty. Bystanders are in particular jeopardy. Collisions between fleeing vehicles and pedestrians or others who get in the way are common. Thus, if all escapes are violent crimes, all flights to avoid arrest must be violent crimes. Indeed, flight may be even more dangerous than escape, because many escapes do not entail flight to avoid capture–but all flights involve that risk-creating conduct.

Howze, 343 F.3d at 922 (citations omitted); see also Orisnord, 483 F.3d at 1182-83; Martin, 378 F.3d at 583 (suggesting "fleeing and eluding in most settings will pose a greater risk of injury than escape").

Moreover,

> the dangerous circumstances surrounding a person's attempt to flee from law enforcement are compounded by the person's operation of a motor vehicle. . . . As a person is in flight from custody, his vehicle has the potential to become a deadly or dangerous weapon. Further, under the stress and urgency which will naturally attend his situation, a person fleeing from law enforcement will likely drive recklessly and turn any pursuit into a high-speed chase with the potential for serious harm to police or innocent bystanders.

Kendrick, 423 F.3d at 809 (citations, quotation marks, alterations omitted); see also Orisnord, 483 F.3d at 1182-83; Martin, 378 F.3d at 583.

Finally we note that a crime of evading or eluding police in a vehicle generally involves a "deliberate choice by the driver to disobey the police officer's signal. This disobedience poses the threat of a direct confrontation between the police officer and the occupants of the vehicle, which, in turn, creates a potential for serious physical injury to the officer, other occupants of the vehicle, and even bystanders." James, 337 F.3d at 391; see also Orisnord, 483 F.3d at 1183; Martin, 378 F.3d at 583. "Such a confrontation inherently presents the serious potential risk of physical injury because the fleeing driver intent on his goal of eluding the officer faces the decision of whether to dispel the officer's interference or yield to it." Martin, 378 F.3d at 583 (quotations, alterations omitted); see also Orisnord, 483 F.3d at 1183.

Thus, we conclude here that a conviction under Utah law for failing to stop a vehicle at an officer's command also categorically presents a serious potential risk of physical injury to another for purposes of § 924(e)(2)(B)(ii).[10] While there may be escapes that do not involve a direct confrontation, a driver's refusal to

_____

[10]Although in applying the categorical approach we cannot rely on the specific conduct on which West's prior conviction is based in order to determine whether his prior conviction qualifies under the ACCA, it is fair to note that the facts underlying his prior conviction for failing to stop at an officer's command, as stated in the PSR, do illustrate why such a conviction will, in the ordinary case, present a serious potential risk of injury to another. West tried to avoid a traffic stop for speeding by accelerating his car through city streets, running several stop signs, spinning out of control in a yard and running through several mailboxes. Clearly such conduct presented a serious potential risk for injury to bystanders and the officers giving chase.

23

stop a vehicle when commanded to do so will always be directly confrontational.

A driver's decision to disobey a police officer's command is much more likely than even an escape to cause the officer to take steps to stop and apprehend the recalcitrant driver. And that effort, when combined with the defendant's efforts to avoid capture, will, in the ordinary case, categorically present a serious potential risk of injury to others. Therefore, a prior conviction under Utah law for failing to stop a vehicle on an officer's command will, categorically, present a serious potential risk of injury to another. See United States v. Spells, 537 F.3d 743, 749-51 (7th Cir. 2008) (reaching the same conclusion, after Begay, regarding an Indiana conviction for "fleeing a law enforcement officer, in a vehicle").

ii.    **Whether a Utah conviction for failing to respond to an officer's command is roughly similar in kind, as well as degree of risk posed, to those crimes specifically enumerated in § 924(e)(2)(B)(ii)**

Begay makes clear that to qualify as a violent felony under the ACCA's residual language, it is not enough for a prior conviction to present a serious potential risk of physical injury to another. See 128 S. Ct. at 1584-85. The conviction must also be "roughly similar, in kind as well as in degree of risk posed, to" those offenses specifically enumerated in 18 U.S.C. § 924(e)(2)(B)(ii). Begay, 128 S. Ct. at 1585.

In Begay, the Court concluded that a conviction for driving under the influence of alcohol ("DUI") did not fall within the ACCA's residual language.

24

See id. at 1583, 1588. But that decision is not easily applied to convictions for other types of offenses. Accord United States v. Charles, 566 F. Supp. 2d 1229, 1233 (D. Kan. 2008) (noting "[t]he application of the Begay decision is hardly a simple proposition").

### a. *Begay's holding*

In the first part of the Begay opinion, the Court considered § 924(e)(2)(B)(ii)'s legislative history, explaining that the ACCA originally enhanced sentences only of offenders with three prior convictions for robbery or burglary. See id. at 1585-86. In amending that provision, "Congress sought to expand that definition to include both crimes against the person (clause (i)) and certain physically risky crimes against property (clause (ii))." Id. at 1586. "When doing so, Congress rejected a broad proposal that would have covered every offense that involved a substantial risk of the use of physical force against the person or property of another. Instead, it added the present examples." Id. (quotation, citations omitted).

This discussion in Begay suggests that Congress intended § 924(e)(2)(B)(ii)'s residual language to include other risky property crimes that are similar to the expressly listed offenses. The Begay Court did not end its discussion with the act's legislative history, however. Instead, the Court shifted directions:

[T]he Armed Career Criminal Act focuses upon the special danger

25

created when a particular type of offender–a violent criminal or drug trafficker–possesses a gun. In order to determine which offenders fall into this category, the Act looks to past crimes. This is because an offender's criminal history is relevant to the question whether he is a career criminal, or, more precisely, to the kind or degree of danger the offender would pose were he to possess a gun.

> In this respect–namely, a prior crime's relevance to the possibility of future danger with a gun–crimes involving intentional or purposeful conduct (as in burglary and arson) are different than DUI, a strict liability crime. In both instances, the offender's prior crimes reveal a degree of callousness toward risk, but in the former instance they also show an increased likelihood that the offender is the kind of person who might deliberately point the gun and pull the trigger.

Begay, 128 S. Ct. at 1587 (citations omitted). Based upon this reasoning, the Court ultimately indicated that prior convictions falling within § 924(e)(2)(B)(ii)'s residual language should be similar to burglary, arson, extortion or crimes involving explosives because they "typically involve purposeful, violent, and aggressive conduct." Begay, 128 S. Ct. at 1586 (quotations omitted).

The first part of Begay's analysis, then, suggests that a crime will be "roughly similar, in kind as well as in degree of risk posed, to" those offenses specifically enumerated in 18 U.S.C. § 924(e)(2)(B)(ii) if the crime is a physically risky crime against property. See Begay, 128 S. Ct. at 1585-86. Several courts have applied Begay in this manner. See United States v. Johnson, 286 Fed. App'x 155, 157-58 & 158 n.5 (5th Cir. 2008) (unpublished) (per curiam) (applying Begay and holding that prior Arkansas conviction for terroristic threatening—that is, for threatening to cause the death of another—was not a violent felony under the ACCA's residual language

26

because it was not a risky property crime like the offenses specifically set forth in § 924(e)(2)(B)(ii)); cf. United States v. Nichols, 563 F. Supp. 2d 631, 636 (S.D. W.Va. 2008) (noting, among other things, that 18 U.S.C. § 924(e)(2)(B)(ii)'s enumerated offenses "involve inherent actions of trespass against persons, property, or both"). Reading Begay in this manner would arguably exclude the offense at issue here from § 924(e)(2)(B)(ii)'s residual provision—a Utah conviction for failing to stop at an officer's order is not a property crime, risky or otherwise. We reject that interpretation of Begay, however.

Instead, relying on the second part of the opinion, we read Begay to hold that the crime at issue is sufficiently similar to the offenses enumerated in § 924(e)(2)(B)(ii) if it "typically involves purposeful, violent, and aggressive conduct." Begay, 128 S. Ct. at 1586 (quotations omitted). We interpret Begay in this manner for several reasons.

First, although Begay discusses the fact that Congress intended that § 924(e)(2)(B)(ii) cover physically risky property crimes, the dispositive section of the Begay opinion specifically holds, instead, that the ACCA's residual language includes prior convictions for offenses that, like burglary, arson, extortion or crimes involving explosives, concern conduct that is "purposeful, violent, and aggressive." See Begay, 128 S. Ct. at 1584-86.

Second, even the specific crimes enumerated in § 924(e)(2)(B)(ii) are themselves not exclusively physically risky property crimes. For instance, while

27

"[a]t common law, extortion is committed when a public officer, under color of office, corruptly obtains a fee to which he is not entitled," Charles E. Torcia, 4 Wharton's Criminal Law § 654 (15th ed. Sept. 2008), "[t]he crime of extortion has been expanded by statute to include the obtaining of money, property, or anything of value by any person, by means of a threat," id. § 658 (emphasis added). Similarly, § 924(e)(2)(B)(ii)'s enumerated crime of burglary, defined generically by the Supreme Court in Taylor, is not exclusively a property crime. For purposes of the ACCA, the Taylor Court defined generic burglary to have "the basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." 495 U. S. at 599. Thus, while the unauthorized entry into a building is a property crime, the second element of generic burglary—an intent to commit a crime—encompasses a broad range of criminal conduct that may be directed at property or at a person. See Wayne R. LaFave, 3 Substantive Criminal Law, § 21.1(e) (2d ed. 2003). And the use of explosives does not necessarily require use against property rather than use against a person.

The third reason we decline to limit the ACCA's residual language to only property crimes is that, as the Supreme Court noted in Begay, the focus of the ACCA is on gun violence, see Begay, 128 S. Ct. at 1586; see also id. at 1595 (Alito, J., dissenting), and keeping guns out of the hands of criminals who act purposefully and who have violent backgrounds, see Spells, 537 F.3d at 751-53. Enhancing a later sentence for gun possession only because the defendant had several prior convictions

28

for property crimes would not necessarily serve that purpose. It is a much closer fit to enhance the sentence of a defendant who has a criminal history involving "purposeful, violent and aggressive" crimes.

Fourth, it is important to note that if a property crime was the lynchpin, the Begay Court could have concluded, but did not conclude, that a prior DUI conviction did not fall within § 924(e)(2)(B)(ii)'s residual language because it was not a property crime. See Charles, 566 F. Supp. 2d at 1234 (D. Kan.) (noting that if the relevant question under Begay were whether the prior conviction was for a property crime, "one is left with the question why the majority in Begay did not simply distinguish DUI as a non-property crime, or at least mention this distinction, instead of discussing how DUI did not involve purposeful, violent and aggressive conduct"). Rather, the Court specifically held instead that DUI was a strict liability crime that was not purposeful, violent and aggressive. See Begay, 128 S. Ct. at 1586-88. The focus of Begay's dispositive section, therefore, was more on the manner in which a perpetrator committed a crime rather than the category of the crime committed.

Lastly, our conclusion that Begay requires that a crime falling within the ACCA's residual language be one involving purposeful, violent and aggressive conduct is bolstered by the fact that a weighty majority of courts applying Begay have drawn this same conclusion and have focused on this same language. See United States v. Herrick, No. 07-1553, 2008 WL 4603551, at *5 & n.7, *6 n.8 (1st Cir. Oct. 17, 2008) (to be reported at 545 F.3d 53); United States v. Jennings, 544

29

F.3d 815, 820 (7th Cir. 2008); <u>Smith</u>, 544 F.3d at 784-85 (7th Cir.); <u>United States v. Templeton</u>, 543 F.3d 378, 380, 382-83 (7th Cir. 2008); <u>United States v. Williams</u>, 537 F.3d 969, 972, 974-75 (8th Cir. 2008); <u>Spells</u>, 537 F.3d at 751-52 (7th Cir.); <u>United States v. Billups</u>, 536 F.3d 574, 582-83 (7th Cir. 2008); <u>Gray</u>, 535 F.3d at 131-32 (2d Cir.); <u>Archer</u>, 531 F.3d at 1351 (11th Cir.); <u>Mayer</u>, 530 F.3d at 1108-09 (9th Cir.); <u>United States v. Bartee</u>, 529 F.3d 357, 363 (6th Cir. 2008); <u>Williams</u>, 529 F.3d at 7 (1st Cir.); <u>United States v. Davis</u>, No. 07-CR-49-LRR, — F. Supp. 2d —, 2008 WL 4290959, at *4 (N.D. Iowa Sept. 17, 2008); <u>United States v. France</u>, 574 F. Supp. 2d 801, 807 (W.D. Mich. 2008); <u>United States v. Rodriguez</u>, 571 F. Supp. 2d 580, 586-88 (S.D.N.Y. 2008); <u>Charles</u>, 566 F. Supp. 2d at 1233-35 (D. Kan.); <u>United States v. Dates</u>, No. 06-0083, 2008 WL 2620162, at *2 (W.D. Pa. June 30, 2008); <u>United States v. Lee</u>, No. 07-CR-131, 2008 WL 2595190, at *1 (E.D. Wis. June 27, 2008); <u>United States v. Harris</u>, No. 1:08cr45 (JCC), 2008 WL 2228526, at *3 (E.D. Va. 2008); <u>Papakee</u>, 550 F. Supp. 2d at 1002-03 (N.D. Iowa). <u>See generally</u> <u>United States v. Morris</u>, 527 F.3d 1059, 1060-61 (10th Cir. 2008) (focusing on this language when addressing <u>Begay</u> generally); <u>United States v. Urbano</u>, No. 07-10160-01-MLB, 2008 WL 1995074, at *2 (D. Kan. May 6, 2008) (same). <u>But see</u> <u>Johnson</u>, 2008 WL 2725494, at *2 & n.5 (5th Cir.) (unpublished) (reading <u>Begay</u> to require a crime to be a property crime to satisfy the residual clause).

Thus, we conclude that the Court did not limit § 924(e)(2)(B)(ii) to property crimes, but instead held that a prior conviction falling into the residual language

30

must involve purposeful, violent and aggressive conduct. See Begay, 128 S. Ct. at 1584-86.

> ### b. Whether a Utah conviction for failing to stop at an officer's command involves purposeful, violent, and aggressive conduct

We next consider whether West's conviction for failing to stop at an officer's command was for an offense that involves purposeful, violent and aggressive conduct. See generally Williams, 529 F.3d at 7 (noting the difficulty in making this determination because "[a]djectives like 'purposeful' and 'aggressive' denote qualities that are ineluctably manifested in degree and appear in different combinations; they are, therefore, imprecise aids" (footnote omitted)); Rodriguez, 571 F. Supp. 2d at 585 (noting the Supreme Court "did not elaborate on what it meant by writing that burglary, for instance, is typically 'purposeful, violent, and aggressive'"). Applying a categorical approach, we look "only to the fact of conviction and the statutory definition of the prior offense, and do not generally consider the particular facts disclosed by the record of conviction" to determine if "the conduct encompassed by the elements of the offense, in the ordinary case," qualifies as a violent felony under the ACCA's residual language. James, 127 S. Ct. at 1593-94, 1597 (quotation marks omitted); see also Fell, 511 F.3d at 1039-40.

Again, the Utah statute at issue here provides that

[a]n operator who receives a visual or audible signal from a peace officer to bring the vehicle to a stop may not:

31

> (i) operate the vehicle in willful or wanton disregard of the signal so as to interfere with or endanger the operation of any vehicle or person; or
>
> (ii) attempt to flee or elude a peace officer by vehicle or other means.

Utah Code § 41-6a-210(1)(a).

### i.   *Violent and aggressive*

Applying a categorical approach, we conclude that a conviction under this statute will, in the ordinary case, involve violent and aggressive conduct. "As commonly understood, aggressive behavior is offensive and forceful and characterized by initiating hostilities or attacks." Charles, 566 F. Supp. 2d at 1238 (citing American Heritage Dictionary of the English Language (4th ed. 2006)).

There is little doubt that knowingly flaunting the order of a police officer is aggressive conduct. See Spells, 537 F.3d at 752 (concluding that using a vehicle knowingly or intentionally to flee from an officer "is inherently 'aggressive'"); see also Charles, 566 F. Supp. 2d at 1238. "Taking flight calls the officer to give chase, and aside from any accompanying risk to pedestrians and other motorists, such flight dares the officer to needlessly endanger himself in pursuit." Spells, 537 F.3d at 752 (holding Indiana offense of fleeing from a police officer was an aggressive crime, even though the state statute did not require proof that the defendant endangered others). Like "[b]urglary of a dwelling, arson, extortion, and the use of explosives," therefore, failing to stop at an officer's command

comprises an act "aimed at other persons or property where persons might be located and thereby injured." Archer, 531 F.3d at 1351.

Drawing again on the analogy between failing to stop at an officer's command and an escape from custody further bolsters our conclusion.

> The typical conduct involved in escaping from . . . custody fits the meaning of aggressive as well as the typical conduct involved in burglary [one of the offenses enumerated in 18 U.S.C. § 924(e)(2)(B)(ii)]. An escapee takes the offensive in defying the authority of the . . . officers to confine him. In doing so, the offender knows his actions will be considered hostile by the responsible . . . officers who will be expected to resist, oppose and resolve the hostile situation with all reasonable force. Similarly, a burglar takes the offensive in trespassing upon another's property for the purpose of taking something while knowing that any occupant of the property would likely consider the burglar's actions to be a hostile action.

Charles, 566 F. Supp. 2d at 1238. But cf. Templeton, 543 F.3d at 383-84 (noting that, while some escapes could involve more purposeful, violent and aggressive conduct than burglary or extortion, walkaway escapes or a failure to report to custody are not sufficiently violent or aggressive to fall under the ACCA's definition of a violent felony). For similar reasons, we conclude that failing to stop at an officer's command is also an aggressive offense.

In addition, it is, like burglary, a violent offense.

> [T]he Supreme Court in Taylor identified the violent aspect of a burglary as the possible confrontation between the burglar and the occupant or someone else investigating. The Court went so far as to recognize that the offender's own awareness of this possibility may mean that he is prepared to use violence if necessary to carry out his plans or to escape. More recently, the Supreme Court in James

33

described this same possible confrontation as the main risk of burglary. Thus, a burglar's entry need not be violent, for it creates the possibility of violence should the burglar confront an occupant, officer or bystander. This same kind of potential for violence exists with an escape offense, but it typically exists to a greater degree. With an escape, the offender may not need violence to leave his confinement, but his offense is not over until he is confronted by an officer in a situation typically accompanied by force and violence.

Charles, 566 F. Supp. 2d at 1238 (citations, quotations omitted). But cf. Templeton, 2008 WL 4140616, at 383-84.

Like burglary, and even more like escape, the offense of failing to stop at the command of a police officer will typically lead to a confrontation with the officer being disobeyed. It is likely to lead, in the ordinary case, to a chase or at least an effort by police to apprehend the perpetrator. All of these circumstances increase the likelihood of serious harm to the officers involved as well as any bystanders that by happenstance get in the way of a fleeing perpetrator or his pursuers. For these reasons, we conclude that the crime of failing to stop at an officer's command is, in the ordinary case, an offense involving violent and aggressive behavior. See Lee, 2008 WL 2595190, at *1 (E.D. Wis.) (applying Begay and concluding a prior Wisconsin conviction for fleeing was violent and aggressive). But see Urbano, 2008 WL 1995074, at *2-*3 (D. Kan.) (concluding prior Kansas conviction for fleeing did not encompass violent and aggressive conduct sufficient to be considered a crime of violence under U.S.S.G. § 4B1.2(a)(2), because "[a] person may be charged with fleeing and eluding for

34

merely failing to stop after an officer signals for that individual to stop. To be charged with a felony" under the Kansas statute, "a person may [only] fail to stop and then drive around a tire deflating device.").

### ii. *Purposeful*

Begay also requires that a crime that falls within the ACCA's residual language be purposeful. See 128 S. Ct. at 1586. Begay equates purposeful with deliberate or intentional. See id. at 1587-88; see also Spells, 537 F.3d at 752 (concluding Indiana statute proscribing "knowingly or intentionally" fleeing a police officer encompasses purposeful conduct that falls within the ACCA's residual language); Gray, 535 F.3d at 131 (noting Begay's strong emphasis on "intentional-purposeful-conduct"); Charles, 566 F. Supp. 2d at 1238 (noting "the deliberate kind of behavior associated with violent criminal use of firearms" discussed in Begay) (quotation omitted).

The second section of the Utah statute, which criminalizes attempting to flee or elude police after receiving a signal to stop, clearly proscribes purposeful conduct. See Urbano, 2008 WL 1995074, at *2 (D. Kan.) (concluding that conduct addressed by Kansas statute that proscribes "willfully" failing or refusing to bring a vehicle to a stop, "or . . . otherwise flee[ing] or attempt[ing] to elude a pursuing police vehicle or police bicycle," "clearly would be a result of purposeful conduct"). Such conduct, in the ordinary sense, see James, 128 S. Ct. at 1597, will be purposeful behavior. See Spells, 537 F.3d at 752. Furthermore,

35

> [a]n individual's purposeful decision to flee an officer in a vehicle when told to stop, reflects that if that same individual were in possession of a firearm and asked to stop by police, they would have a greater propensity to use that firearm in an effort to evade arrest. This link between using a vehicle to flee an officer, and that same individual's likelihood of using a gun when fleeing in the future, distinguishes this crime from those listed by the Court in Begay as being "dangerous," but not reflective of someone "whom one normally labels an armed career criminal."

Id. at 752-53 (quoting Begay, 128 S. Ct. at 1587 (further quotation, alterations omitted); relying on crime statistics from the Department of Justice's Bureau of Justice Statistics).

For similar reasons, the first section of the Utah statute—applying to a driver who, after receiving an officer's signal to stop, operates a "vehicle in willful or wanton disregard" of that signal, "so as to interfere with or endanger the operation of any vehicle or person"—also addresses purposeful conduct. See Utah Code § 41-6a-210(1)(a)(i). Wilfully disregarding an officer's signal is purposeful conduct under the ACCA. Purposeful means "[d]one with a specific purpose or mind; Deliberate." Black's Law Dictionary (8th ed. 2004). And willful "means . . . intentionally or purposely as distinguished from accidentally or negligently."[11] Id.

---

[11]Utah courts, in other circumstances, have treated willful conduct as purposeful, see Green v. Turner, 4 P.3d 789, 793 (Utah 2000) (citing State v. Larsen, 865 P.2d 1355, 1358 (Utah 1993)), or deliberate, see State v. Merila, 966 P.2d 270, 272 (Utah Ct. App. 1998); State v. Briggs, No. 20051061-CA, 2007 WL 772771, at * 2 (Utah Ct. App. Mar. 15, 2007) (unpublished). See generally 1 Wayne R. LaFave, Substantive Criminal Law §§ 5.1(c), 5.2(b) (2d ed. 2003)

(continued...)

To the extent that the term "wanton," as used in this first section of the Utah statute, can be read separately from the term "wilful," it still, in the ordinary case, see James, 128 S. Ct. at 1597, will encompass deliberate or intentional conduct. See Utah Code § 41-6a-210(1)(a)(i). The statute specifically requires that the driver first "receive" the officer's signal. It is only after the driver has received an officer's signal to stop and then disregards that signal that the driver's conduct becomes criminal. Disregarding a signal after receiving it will, in the ordinary case, see James, 128 S. Ct. at 1597, be knowing and deliberate or intentional. Such conduct is purposeful under Begay. That is all we need to determine here.[12]

### 3. Conclusion

For these reasons, a conviction under Utah's failure-to-stop statute will, in

---

[11](...continued)
(discussing Model Penal Code and equating acting with intent to acting purposefully).

[12]The Utah Supreme Court has never addressed the state of mind this section requires. The Utah Court of Appeals did consider this language in State v. Simpson, 904 P.2d 709 (Utah Ct. App. 1995), but that case presented a different issue. In Simpson, the court was considering an earlier version of this statute which, although using the same language as the current statute, did not divide that language into different sections, as the current statute does. The later revision of the statute into sections may well affect the meaning the Utah Court of Appeals suggested in Simpson. And Simpson addressed a different question than the one presented here. In Simpson, the issue the Utah Court of Appeals had to resolve was whether the offense of disobeying a police officer should be deemed a lesser included offense of failing to stop at an officer's command. See id. at 712. Thus, we conclude that Simpson does not govern the question we must decide in this case.

the ordinary case, involve purposeful, as well as violent and aggressive, conduct. On this basis, we AFFIRM the district court's determination that West had a total of three prior convictions that qualify as violent felonies under the ACCA. As a result, West was subject to a statutory mandatory minimum fifteen-year sentence.

**B.     Whether the district court erred in calculating West's offense level**

West challenges the district court's calculation of his offense level under the sentencing guidelines. The district court made that calculation in the following manner: The court started with the base offense level of 24 which applies to convictions for unlawfully possessing a firearm after "at least two felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 2K2.1(a)(2).[13] The court then added the following: two offense levels because the firearm West admitted possessing was stolen, see id. § 2K2.1(b)(4); four offense levels because West possessed this firearm "in connection with another felony offense," id. § 2K2.1(b)(5);[14] and six offense levels because West, "in a manner creating a substantial risk of serious bodily injury," and "knowing or having reasonable cause to believe that a person was a

---

[13]The district court applied the 2005 sentencing guidelines.

[14]U.S.S.G. § 2K2.1(b)(5) requires the district court to add four offense levels "[i]f the defendant used or possessed any firearm or ammunition in connection with another felony offense." In this case, the PSR added four levels on this basis, noting West's actions in "committing [the] offenses of Assault on a Police Officer, Flight from Law Enforcement, and Assault With a Dangerous Weapon (dangerous use of a fleeing vehicle)," as well as kidnapping, provided a sufficient basis for this offense-level enhancement.

law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom," id. § 3A1.2(c)(1). Those additional offense levels resulted in an offense level of 36.[15] Finally, the district court reduced this offense

<hr/>

[15]U.S.S.G. § 4B1.4(b) provides that

[t]he offense level for an armed career criminal is the greatest of:

> (1) the offense level applicable from Chapters Two and Three; or
>
> (2) the offense level from § 4B1.1 (Career Offender) if applicable; or
>
> (3)  (A) **34**, if the defendant used or possessed the firearm or ammunition in connection with either a crime of violence, as defined in § 4B1.2(a), or a controlled substance offense, as defined in § 4B1.2(b), or if the firearm possessed by the defendant was of a type described in 26 U.S.C. § 5845(a); or
>
>     (B) **33**, otherwise.

(Footnote omitted.)  Because in this case West's offense level calculated under Chapters Two and Three, 36, was the greatest of these possible offense levels, that is the offense level the district court applied.  Even if West succeeds here in reducing his Chapters Two and Three offense level calculations by twelve, the lowest offense level he can receive, as an armed career criminal, is 33. See U.S.S.G. § 4B1.4(b).  The offense level must be reduced by three more levels because of West's acceptance of responsibility, see U.S.S.G. § 3E1.1.  See id. § 4B1.4(b). Combined with West's criminal history category of VI, that would produce an offense level of 30, which results in an advisory sentencing range of 168 to 210 (instead of 235 to 293).  See U.S.S.G. Sentencing Table.  If he qualifies as a career offender under the ACCA, however, West would still have to serve his statutory mandatory minimum fifteen-year, or 180-month, sentence.  If so, the relevant within-guideline range, based upon this lower offense level, would be between 180 and 210 months, lower than the 235-month sentence that

(continued...)

level by three, under U.S.S.G. § 3E1.1, for West's acceptance of responsibility. This produced a total offense level of 33. Coupled with West's category VI criminal history, this offense level resulted in an advisory guideline range of between 235 and 293 months.

On appeal, West argues that the district court erred in applying the two-level enhancement for possessing a stolen firearm; the four-level enhancement for possessing the firearm in connection with another felony; and the six-level enhancement for assaulting a police officer.[16] These three

---

[15](...continued)
the court previously imposed.

[16]Citing Fed. R. App. P. 28, the Government argues that West failed to present this argument adequately in his brief. "Federal Rule of Appellate Procedure 28(a)(9)(A) requires appellants to sufficiently raise all issues and arguments on which they desire appellate review in their opening brief. An issue or argument insufficiently raised in the opening brief is deemed waived." Becker v. Kroll, 494 F.3d 904, 913 n.6 (10th Cir. 2007). This is "[b]ecause the appellant comes to the court of appeals as the challenger, [and thus] bears the burden of demonstrating the alleged error and the precise relief sought." Hernandez v. Starbuck, 69 F.3d 1089, 1093 (10th Cir. 1995).

West's brief is admittedly confusing. And in the section of his brief captioned "Mr. West Should not have been subjected to a 12 level Enhancement based on Uncharged Related Conduct, or Conduct Characteristics not found by a preponderance," he does not argue that the district court erred in applying these three enhancements. Instead, he challenges the appellate presumption that a sentence imposed within an advisory guideline range is reasonable. Nevertheless, in at least five different places in his brief, West does challenge the district court's application of these enhancements. And he clearly does so by arguing there was no evidence to support the district court's application of these enhancements to his case. We deem this sufficient to raise this issue before this court.

challenged enhancements were based upon facts set forth in the PSR:

> 6. Investigation into the instant offense began on August 9, 2005, when Lehi Police were dispatched to a gas station when a woman reported to the owner that she was being kidnaped [sic]. When police arrived they blocked the defendant's car with their vehicles. As they began questioning the defendant, he put the car into reverse, backed up abruptly, and recklessly hit the building. While the officer was reaching into the vehicle the defendant put his car into drive and rammed the patrol car, causing injuries to the officer, who was hanging onto the car at the time. He then put the vehicle into reverse again and floored the accelerator. The defendant again rammed the building and then forward again as he rammed the patrol car again while flooring the accelerator and spinning the rear tires as he was attempting to push the patrol car out of its position. The defendant did not stop his attempts to escape until an officer drew his weapon and pointed it at him. When officers were attempting to restrain the defendant, he continued to resist arrest. While searching the defendant police found a baggie of methamphetamine.

> 7. Officers interviewed the kidnaping [sic] victim, and she reported that the defendant and co-defendant entered her apartment and said that she owed them money. She reported the defendant had nun chucks, and told her he had mace. The defendant threatened to have her guest shot if he (the guest) did not leave. She was told that she was going to go with them and pay for gas for their vehicle. When they arrived at the gas station she informed the clerk that she was being kidnaped [sic] and locked herself in the bathroom.

> 8. Police searched the vehicle and found a stolen, fully loaded Ithaca model 37, 12-gauge sawed-off shotgun in between the driver's seat and the center console. The overall length of the shotgun measured 31 inches, with a barrel length of 24 inches. Also found in the vehicle was 218.2 grams of marijuana packaged for sale in a large baggie wedged in between the coolant reservoir and the engine firewall.

(R. v. VI, PSR paras. 6-8.)

West challenged these facts before the district court. In the first of three sentencing memoranda he filed, West specifically objected to the four-level

41

increase for using the firearm in connection with a felony and the six-level enhancement for assaulting a police officer, arguing that "at least 10 levels of enhancements" were "unsubstantiated and unproven." Later in that same memorandum, he asserted that "[t]here is no evidence sufficient to prove either beyond a reasonable doubt or by a preponderance the facts alleged that give rise to" these two enhancements and argued that "in fact no one was kidnapped, or injured."[17] In response to that argument, the Government submitted to the district court a video of West's attempt to escape from police custody and informed the district court that it would have its case agent available to testify at sentencing. The Government, however, never offered the case agent's testimony at sentencing.

During the sentencing proceeding itself, West reiterated that "we're here to categorically say that there was no kidnapping. This woman, I think, panicked when the police arrived and Mr. West's position is she was going with us to get some drugs." In addition, West for the first time challenged the two-level enhancement for possessing a stolen firearm. Defense counsel specifically argued to the sentencing court, "I have yet to see any documentation that that firearm was stolen, but there is somebody that is saying that that firearm is stolen and more likely the state has produced somebody, hearsay, whatever it is, indicating

---

[17]When a defendant objects to a fact stated in the PSR, the Government bears the burden of proving that fact by a preponderance of the evidence. See United States v. Wilken, 498 F.3d 1160, 1169 (10th Cir. 2007).

that that firearm may have been stolen."

By disputing the PSR's factual assertions underlying the application of the three challenged enhancements, West invoked the district court's Rule 32(i)(3)(B) fact-finding obligation. "[T]o invoke the district court's Rule 32 fact-finding obligation, the defendant is required to make specific allegations of factual inaccuracy." United States v. Tindall, 519 F.3d 1057, 1062 (10th Cir. 2008) (quotation marks omitted); see also Chee, 514 F.3d at 1115. The defendant has "an affirmative duty to make a showing that the information in the presentence report was unreliable and articulate the reasons why the facts contained therein were untrue or inaccurate." Chee, 514 F.3d at 1115 (quotation marks, alterations omitted); see also Avalos, 506 F.3d at 979-80. West met that duty in this case.

Fed. R. Crim. P. 32(i)(3)(B) requires that the district court "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." A sentencing court's "ruling on a disputed issue need not be exhaustively detailed, but it must be definite and clear." United States v. Williams, 374 F.3d 941, 947 n.9 (10th Cir. 2004) (applying earlier version of Rule 32); see also United States v. Ayon, 226 Fed. App'x 834, 837 (10th Cir. June 19, 2007) (unpublished) (applying same principle to current Rule 32); United States v. Solano-Ramos, 220 Fed. App'x 817, 821 (10th Cir. Mar. 27, 2007)

43

(unpublished) (same, in dicta).

We review de novo whether the district court complied with its Rule 32 obligations, see Tindall, 519 F.3d at 1062, and conclude it did not in this case. The court never specifically addressed West's objections to the PSR's facts. Instead, the court simply adopted the PSR "without change." Adopting the PSR is insufficient to satisfy the court's Rule 32's fact-finding obligation. See United States v. Rodriguez-Delma, 456 F.3d 1246, 1253 (10th Cir. 2006); United States v. Dallah, 192 Fed. App'x 725, 730 (10th Cir. Aug. 10, 2006) (unpublished); United States v. Begay, 117 Fed. App'x 682, 683 (10th Cir. Dec. 8, 2004) (unpublished); see also Williams, 374 F.3d at 947 (applying earlier version of Rule 32); United States v. Guzman, 318 F.3d 1191, 1198 (10th Cir. 2003) (same, citing cases).

"If the district court fails to comply with Rule 32(i)(3)(B), we must remand for the court to either make the necessary findings or enter a declaration that it did not take the controverted matters into account in sentencing the defendant." United States v. Cereceres-Zavala, 499 F.3d 1211, 1213-14 (10th Cir. 2007). For these reasons, we are compelled to REMAND this case, directing the district court to resolve the factual disputes West raised or explain why it is unnecessary for sentencing purposes to do so.[18] If the district court determines that the

---

[18]To the extent that West also argues on appeal that the district court abused its discretion in refusing to impose a sentence below the advisory guideline range,
(continued...)

Government did not prove the disputed facts by a preponderance of the evidence, the district court should then conduct a new sentencing proceeding, excluding those disputed and unproven factual allegations.

### III. Conclusion

We REMAND for the district court to conduct proceedings consistent with this decision.

---

[18](...continued)
we do not need to address that argument here.