In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 07-2428

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ABRAHAM N. ROBINSON,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 06 CR 40113—**Michael M. Mihm**, *Judge.*

———————

ARGUED JANUARY 16, 2008—DECIDED AUGUST 12, 2008

———————

Before MANION, WOOD, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Abraham Robinson conditionally pleaded guilty to being a felon in possession of a firearm, reserving the right to appeal the district court's denial of his suppression motion. He argues that the gun found in his pocket should have been suppressed because it was seized in violation of the Fourth Amendment when police detained and frisked him without reason to suspect he was armed and involved in a crime. We disagree. The officers who conducted the stop and frisk knew that Robinson was a felon, and they had just received information suggesting he was then carrying a gun. They also

personally observed him loitering in a high-crime area at two thirty in the morning, visibly carrying something heavy in his right pants pocket. Together, this information was sufficient to justify the stop and weapons frisk.

Robinson also challenges his sentence, claiming the district court improperly applied sentencing guidelines enhancements for assault of an official victim and for possessing a gun in connection with another felony. *See* U.S.S.G. §§ 3A1.2(c)(1), 2K2.1(b)(6).[1] We conclude that the enhancement for assault of an official victim was properly applied, but the district court's findings do not adequately support application of the "other felony" enhancement. Accordingly, we affirm Robinson's conviction but vacate his sentence and remand for further proceedings consistent with this opinion.

## I. Background

At two thirty in the morning on a late-September day in 2006, police in Rock Island, Illinois, established a substantial presence outside Jimmy's Bar, a tavern in a tough neighborhood on the west end of town. The bar was notorious for fights and shootings that tended to erupt around closing time, and six officers were stationed there to ensure there was no repeat of recent violent incidents. As they stood watch, a citizen known to one of the officers approached and reported that "Salty Dog"

---

[1] In the November 1, 2006 edition of the guidelines—which applied at Robinson's sentencing—the guideline was numbered U.S.S.G. § 2K2.1(b)(5). We cite to the current (2007) version of the guidelines because no relevant changes have been made.

was in the area carrying a handgun. A few minutes later the source—who said he had heard this information from a woman inside the bar—told the officers that Salty Dog had come to Jimmy's to avenge a fight that occurred there a week earlier but had been turned away by bar employees when they learned he was armed and planning revenge.

The officers were well-acquainted with Salty Dog. He was Abraham Robinson, a habitual criminal with gang ties who had served time in prison for a drug offense. They also knew he was a suspect in a 2002 shooting and had himself been the target of a separate shooting that same year. The officers' source on the scene outside Jimmy's said Robinson was wearing a red t-shirt and jeans and was about a half block away, milling about in a large crowd in an open field abutting a house that had recently been the scene of several fights, drive-by shootings, and a homicide.

About fifteen minutes later, officers received a report of a 911 call from Jeffie Lee, the owner of the house next to the field where Robinson was located. Lee told the 911 operator she had just received a telephone call informing her that a man with a gun was standing in the crowd outside her house. The officers (who were also familiar with Lee) then approached the home but did not act immediately because they were seriously outnumbered. The throng of people was about 60 or 70 strong, and the officers feared a riot if they tried to confront Robinson. As they waited for the crowd to disperse, one officer observed that Robinson kept "favoring his right side," pulling his pants up on that side and patting his right pants pocket. He was acting as if he had something heavy in that pocket, and the officer, not surprisingly, suspected it was the gun Robinson was reported to be carrying.

As the crowd began to clear out, the police supervisor on the scene ordered the officers to "take [Robinson] down now." Five or six officers approached from behind, and when they were arm's length from Robinson, one officer yelled: "Police. Stop. Put your hands up."

A struggle ensued. Robinson reached for his waist-band or his right pants pocket, and the officers tried to grab his hands to get control over him. That effort did not initially succeed, and one officer warned Robinson that he would be Tasered if he did not put his hands up. Robinson kept on struggling, and the officers continued to have difficulty subduing him—he was more than six feet tall and weighed more than 300 pounds. The officers ultimately resorted to using the Taser, and although Robinson's resistance continued, one officer managed to remove a large, loaded Smith & Wesson revolver from Robinson's right pants pocket.

Robinson was charged with being a felon in possession of a firearm but sought to have the evidence of the gun suppressed, arguing that the stop and frisk were conducted without reasonable suspicion, in violation of his Fourth Amendment rights. The district court denied the suppression motion, and Robinson conditionally pleaded guilty, reserving the right to appeal the suppression decision.

At sentencing the judge applied a sentencing enhancement for assault of an official victim because Robinson had assaulted the officers who were trying to frisk him. *See* U.S.S.G. § 3A1.2. The judge also found that Robinson had attempted to shoot the officers and on that basis applied an enhancement for illegal possession of a firearm in connection with another felony. *See* U.S.S.G. § 2K2.1(b)(6). With these enhancements Robinson's guidelines sen-

tence was equal to the statutory maximum—120 months, *see* 18 U.S.C. § 924(a)(2); U.S.S.G. § 5G1.1—but the court imposed a below-guidelines sentence of 95 months in prison. On appeal, Robinson challenges the denial of his suppression motion and the two sentencing enhancements.

## II. Analysis

### A. The Stop and Frisk

Robinson argues the district court should have suppressed the evidence of the revolver because it was recovered during an illegal search. We disagree. The stop and frisk were legal so long as the officers had a sufficiently good reason—a "reasonable suspicion"—to believe Robinson was illegally carrying a weapon. *See Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Barnett*, 505 F.3d 637, 639-40 (7th Cir. 2007). There was ample reasonable suspicion of that here.[2]

---

[2] The parties argue about precisely when Robinson was "seized" for purposes of the Fourth Amendment. Robinson maintains he was seized when the officers approached and ordered him to stop and put his hands up. The government asserts that because Robinson did not initially submit to the officers' command and show of authority, he was not seized until they applied physical force and he submitted. *See California v. Hodari D.*, 499 U.S. 621, 627-29 (1991); *United States v. Ford*, 333 F.3d 839, 843 (7th Cir. 2003). If this later point in the encounter is considered the seizure, the government argues, then Robinson's resistance supplied probable cause to arrest him for resisting or obstructing an officer under Illinois law. *See* 720 ILL. COMP. STAT. 5/31-1(a). We need not resolve the question; there was reasonable suspicion to support a *Terry* stop and frisk for weapons.

First, the officers had information from two tips: one reporting that Robinson was armed with a gun and looking for a fight, the other relaying a report that a man with a gun was outside Jeffie Lee's house, precisely where Robinson was loitering. Because the officers knew that Robinson was a felon, these tips alone suggested Robinson was committing a crime.[3] *See* 18 U.S.C. § 922(g)(1) (prohibiting firearm possession by felons, the offense of conviction here). These leads were corroborated by a wealth of other information. The officers personally observed that Robinson was carrying something heavy in his right pants pocket. They knew that Jimmy's, the bar that had turned Robinson away, was the regular scene of fights and shootings, particularly at that time of night—bar closing time. They knew that the area around Jeffie Lee's house—where Robinson was loitering, in the midst of a large crowd—had recently been the scene of a murder, a drive-by shooting, and a number of violent fights. *Cf. United States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002) (citing *United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999)) (defendant's presence in "high crime area" is relevant). All of this made it more likely that the tips were accurate.

Moreover, the officers knew that Robinson's criminal history included involvement with guns. They knew he was a gang member, was a suspect in a shooting, and

---

[3] When officers stopped Robinson, they knew he had served time in prison for a drug offense. Although it can be inferred from this that they knew he was a felon, the record is a bit unclear on the point. However, both Robinson and the government acknowledge the officers knew that Robinson was a felon, so we take that fact as established.

was himself the target of a shooting. *Cf. Jackson*, 300 F.3d at 746 (officer's knowledge of prior criminal activity contributes to reasonable suspicion). Combined, this information was more than sufficient to provide reasonable suspicion that Robinson was illegally carrying a gun.

Robinson attempts to avoid this conclusion by emphasizing that the officers' two sources hadn't personally observed that Robinson was carrying a gun. Since the sources were merely relaying information obtained from others, whom the officers didn't know, Robinson characterizes their leads as uncorroborated "anonymous tips," which are generally insufficient to create reasonable suspicion. *See Florida v. J.L.*, 529 U.S. 266, 271-72 (2000).

The tips at issue here, however, did not suffer from the problems typically associated with anonymous tips. In the usual anonymous-tip case, officers cannot assess the credibility of the source and have no way to hold the source responsible if the information turns out to be fabricated. *See id.* That makes the tips less reliable and generally not sufficient to create reasonable suspicion. Here, by contrast, the officers were familiar with both of the sources who relayed information about Robinson, could assess their credibility, and knew where to find them if the information they provided turned out to be false. While the information they conveyed was second-hand, we think it significant that the sources who did come forward were willing to identify themselves to police, suggesting that they found the information about Robinson to be credible and worthy of police attention. The information from these sources was corroborated by other information already known to or acquired by the officers—the officers' personal observations of Robinson protecting something heavy in his pocket, their knowl-

edge of his criminal background, and the crime-laden history of the area where he was loitering—and provided good reason to suspect that Robinson was illegally carrying a gun. The suppression motion was properly denied.

## B.   Sentencing Enhancements

### 1.   Assault of an Official Victim, U.S.S.G. § 3A1.2(c)

Robinson challenges the six-level sentencing guidelines enhancement for assaulting the police officers, *see* U.S.S.G. § 3A1.2(c)(1), claiming there was insufficient evidence to support it. This victim-related adjustment applies when the defendant (1) assaulted an officer during his offense or while fleeing, (2) created substantial risk of bodily harm to the officer, and (3) knew or had reason to believe that the person assaulted was an officer.

The evidence easily supported the second and third of these requirements. Officers testified that Robinson struggled with them and repeatedly attempted to draw his loaded gun, which created a grave risk of serious injury. Robinson knew he was dealing with police officers: they were in uniform and identified themselves by shouting "Police."

But the first requirement—that Robinson assaulted police—requires a bit more explanation. The guideline doesn't define assault, and the exact requirements for assault vary from jurisdiction to jurisdiction. *See United States v. Lee*, 199 F.3d 16, 18-19 (1st Cir. 1999). In most jurisdictions (and in Illinois), assault includes any "conduct which places another in reasonable apprehension of receiving a battery," a standard easily met in this case. *See,*

*e.g.*, 720 ILL. COMP. STAT. 5/12-1(a) (2008). The problem is that in some jurisdictions there is also an intent require- ment that has spawned a great deal of confusion. *Lee*, 199 F.3d at 18-19. Under the most demanding standard, a defendant must intend to "cause apprehension" or actual "bodily harm." 2 WAYNE R. LAFAVE, SUBSTANTIVE CRIMI- NAL LAW § 16.3(b) (2d ed. 2003).

We doubt that such a stringent intent requirement applies to § 3A1.2(c). *See Lee*, 199 F.3d at 19. But even if it did, Robinson's conduct would still qualify as assault. The district court explicitly found that Robinson reached for his gun because he intended to "use the gun unlaw- fully against" officers, and we can't imagine a use of the gun that wouldn't involve an intent to intimidate or to cause bodily harm.

There was, of course, another reasonable explana- tion—that Robinson was trying to get rid of the gun before the police found it. *Cf. United States v. Agee*, 333 F.3d 864 (8th Cir. 2003). But we are satisfied that the judge considered and reasonably rejected this possibility. At sentencing the prosecutor addressed the possibility that Robinson was just trying to throw away his revolver but argued that this explanation was improbable because Robinson was already flanked by half a dozen officers. The district court apparently agreed, and given the evidence, was entitled to do so. The court properly applied the enhancement for assault of an official victim under § 3A1.2(c).

### 2. Firearm Possession "in connection with another felony, " U.S.S.G. § 2K2.1(b)(6)

More problematic, however, is the application of the four-level enhancement under U.S.S.G. § 2K2.1(b)(6),

which applies if Robinson "used or possessed" the gun "in connection with another felony offense." The district court applied the guideline after finding that Robinson repeatedly reached for the gun while resisting the officers. *Cf. United States v. Jackson*, 276 F.3d 1231, 1235 (11th Cir. 2001); *United States v. Rodriquez*, 185 F. App'x 813, 815 (11th Cir. 2006) (unpublished). The court's theory was that Robinson was attempting to shoot the officers and therefore had committed the felony offenses of attempted aggravated battery and attempted aggravated firearm discharge.

While we have accepted the district court's finding that Robinson was not reaching for his gun in order to discard it, the district court's remaining findings do not support the inference that Robinson intended and was attempting to shoot the officers. Reaching for a gun may indicate an intent to point, brandish, *or* fire it, or perhaps to use it in another way—for example, to hold the officers at bay in order to effectuate an escape. Although attempting to shoot (or pistol-whip or otherwise harm) the officers would be a felony attempted aggravated battery, attempting to point or brandish the gun would only be a misdemeanor attempted aggravated assault under Illinois law. *Compare* 720 ILL. COMP. STAT. 5/12-4(b)(18), (e)(2) & (3) (aggravated battery is a Class 1 or 2 felony) *and* 720 ILL. COMP. STAT. 5/8-4(c)(3), (4) (attempt to commit Class 1 or 2 felony is also a felony), *with* 720 ILL. COMP. STAT. 5/12-2(a)(6), (b) (aggravated assault is a Class 4 felony) *and* 720 ILL. COMP. STAT. 5/8-4(c)(5) (attempt to commit a Class 4 felony is a misdemeanor).[4]

---

[4] Robinson's refusal to obey police orders coupled with his repeated attempts to reach the gun in his pocket may also have

(continued...)

The district judge apparently concluded that *any* use of the gun would have been felonious, so he did not distinguish an attempt to shoot the officers from any of the other attempt possibilities that exist on this record, some of which are only misdemeanors. The judge did not formally explain why he chose one option over any other. Further factfinding is required on the application of this enhancement.

Robinson asks us to affirmatively hold that the guideline *cannot* be applied on remand, but we think the district court *could* find that Robinson's conduct amounted to attempted aggravated battery, depending on the court's parsing of the direct and circumstantial evidence. To establish attempted aggravated battery, the government needs to show that Robinson intended to commit a

---

[4] (...continued)

qualified as aggravated assault based on the status of his victims as police officers. Robinson knew they were officers, and his conduct would have put them in "reasonable apprehension of receiving a battery." *See* 720 ILL. COMP. STAT. 5/12-1(a); 5/12-2(a)(6), (16). But this form of aggravated assault is a misdemeanor unless "a firearm [was] used in the commission of the assault." *See* 720 ILL. COMP. STAT. 5/12-2(b) (describing aggravated assault under § 5/12-2(a)(6) and (16) as a misdemeanor "if a firearm is not used"). We cannot conclude that Robinson "used" his gun to commit assault; "use" generally goes beyond mere possession. *Cf. Bailey v. United States*, 516 U.S. 137, 143 (1995) (in federal statute, use of firearm "signifies active employment" and connotes "more than mere possession of a firearm"). So if Robinson's conduct amounted to this form of aggravated assault, it would have been the misdemeanor class of the offense because a firearm was not "used in the commission of the assault."

battery and that he took a substantial step toward doing so. *See* 720 ILL. COMP. STAT. 5/8-4; *People v. Britz*, 349 N.E.2d 418, 420 (Ill. App. Ct. 1976) (discussing attempted aggravated battery). While there is no direct evidence of Robinson's intent, there is some circumstantial support for an inference that he intended to shoot. Robinson was, after all, reaching for a loaded gun, and the fact that it was loaded suggests that he didn't carry the gun just for show. There is also evidence that he was a suspect in another shooting, which might suggest that he uses guns to shoot rather than intimidate. As for the "substantial step" requirement, one officer testified that he believed that Robinson had managed to put his hand on his gun, and at a minimum, Robinson repeatedly reached for his waistband or pocket in an attempt to retrieve his gun, which would qualify as a "substantial step."

Accordingly, we conclude that the police had reasonable suspicion to conduct a *Terry* stop and frisk for weapons, and therefore AFFIRM Robinson's conviction. We reject the first of Robinson's challenges to his sentence, regarding application of the enhancement for assault of an official victim under § 3A1.2(c). We conclude, however, that the district court's findings were insufficient to permit application of the enhancement for possession of a firearm in connection with another felony under § 2K2.1(b)(6). Accordingly, we VACATE Robinson's sentence and REMAND for further proceedings consistent with this opinion.