FILED
United States Court of Appeals
Tenth Circuit

July 27, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

STEVEN ANTHONY FORD,

      Defendant - Appellant.

No. 09-2244

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 1:08-CR-00229-JEC-2)**

Gregory J. Fouratt, United States Attorney, (Terri J. Abernathy, Assistant United States Attorney, on the brief), Las Cruces, New Mexico, for Plaintiff - Appellee.

David L. Plotsky of Plotsky & Dougherty, Albuquerque, New Mexico, for Defendant - Appellant.

Before **KELLY**, Circuit Judge**, McWILLIAMS**, Senior Circuit Judge, and **LUCERO**, Circuit Judge.

**KELLY**, Circuit Judge.

      Defendant-Appellant Steven Anthony Ford was convicted by a jury of

being a felon in possession of firearms and ammunition, 18 U.S.C. § 922(g)(1),

being a fugitive in possession of firearms and ammunition, 18 U.S.C. § 922(g)(2),

and possession of stolen firearms, 18 U.S.C. § 922(j). At sentencing, the district court applied a six-level offense enhancement for assaulting a law enforcement officer during flight, under U.S.S.G. § 3A1.2(c)(1), and found that Mr. Ford's prior convictions mandated a fifteen-year minimum sentence under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e). The court sentenced Mr. Ford to 360 months' imprisonment on the first count, and 120 months on each of the other two counts, all to run concurrently. Our jurisdiction arises under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and we affirm.

## Background

Mr. Ford was serving a state sentence at a Kansas prison until the night of October 28, 2007. 2 R. 20-23. On that night, Mr. Ford and Jesse Lee Bell, a fellow inmate, escaped with the aid of Amber Goff, a former corrections officer with whom Mr. Ford was romantically involved. Ms. Goff had helped Mr. Ford plan the escape. 3 R. 165-70. In preparation, she stole her stepfather's .40 caliber Glock, .22 caliber pistol, and .357 revolver, obtained other supplies such as ammunition and changes of clothes, and rented a getaway car. On the evening of October 28, Mr. Ford called Ms. Goff to set their plan into action. Id. at 170-79, 188. She left the rental car at a nearby shopping center and drove to the prison in her own car. She used bolt cutters to open a gate across an access road, and then drove up to prison's dual perimeter fences. There, she cut through the

exterior fence, tossed the Glock and a set of bolt cutters over the interior fence, and left the .357 on the ground for Mr. Ford and Mr. Bell. Id. at 179-82. Ms. Goff retreated to a hiding place, until she saw the two escapees headed her way, already through the fence. They got in the back seat of the car, each carrying a gun. Ms. Goff then drove the group to the shopping center, where they transferred to the rental car and headed west. Id. at 182-84.

During the drive west, Mr. Ford often kept the Glock loaded and tucked in his waistband or in the glove compartment, and shot it from the moving vehicle at one point. At a stop in eastern New Mexico, the trio saw a story about themselves in USA Today. Concerned that police would connect Ms. Goff and the rental car, they decided to find another vehicle. Id. at 185-90. In the early hours of October 31, they entered Grants, New Mexico, looking for a car to steal in areas where people frequently come and go. They settled on an apartment complex. Mr. Bell and Mr. Ford, with the Glock in Mr. Ford's waistband, left the car to walk around the apartment complex. The men returned to the car about twenty minutes later, but at the arrival of a police car they instructed Ms. Goff to leave for a while. Police arrested Ms. Goff several blocks away. Id. at 192-95.

A resident of the apartment complex had seen two men looking into her car and called the police. Id. at 10. Two officers responded. After speaking to the resident, the officers patrolled the complex. In one indoor hallway, they saw two men. When the officers made eye contact with the men, the men stopped and then

walked away quickly. The officers split up, and one officer saw the men running away from the apartment building. After unsuccessfully trying to scale a fence, the two men separated. One of the officers apprehended Mr. Bell in a field next to the apartment complex. A few minutes after the other officer joined him, they heard four gunshots fired at a "very close" range. The officers immediately ducked down and ordered Mr. Bell to the ground. The officers reported the shots by radio and requested backup. A sheriff's deputy responded and apprehended Mr. Ford in the apartment complex parking lot. Id. at 18-29.

A police detective found shell casings from the Glock about 100 feet from where the officers apprehended Mr. Bell. Id. at 130. Police recovered the Glock about 34 feet from where Mr. Ford was apprehended and found a .22 pistol on Mr. Bell. Id. at 28-29, 130.

On appeal, Mr. Ford challenges: (1) the admission of evidence of his escape from prison; (2) the § 3A1.2 enhancement for assaulting a law enforcement officer during flight; and (3) the finding that a prior Kansas conviction for criminal discharge of a firearm at an occupied building or dwelling qualifies as a violent felony, triggering the ACCA's fifteen-year mandatory minimum sentence. We address the issues in that order.

## Discussion

I.      Admission of Evidence of the Kansas Escape

Mr. Ford challenges the district court's admission of evidence of his Kansas escape as *res gestae* and not barred by Federal Rule of Evidence 403. We review evidentiary rulings for an abuse of discretion. United States v. Batton, 602 F.3d 1191, 1196 (10th Cir. 2010). After considering motions in limine, the district court allowed the government to introduce evidence of Mr. Ford's escape from prison. The court found the evidence admissible under the doctrine of *res gestae* because it was "inextricably intertwined with the charged crimes," particularly "the elements of Defendant being a fugitive from justice, that Defendant possessed stolen firearms and ammunition, and that Defendant had knowledge that the firearms and ammunition were indeed stolen." 1 R. 56. Alternatively, the court would have allowed the evidence as extrinsic evidence offered for a proper purpose under Rule 404(b). Id. at 57-58.

The jury learned of Mr. Ford's escape through the testimony of two witnesses: Todd Kuzusko, a deputy United States marshal, and Ms. Goff, the former corrections officer who helped him escape. Mr. Kuzusko testified that Mr. Ford initiated a conversation while Mr. Kuzusko guarded him during a hospital visit. Mr. Ford related to Mr. Kuzusko the details of his escape and his capture, establishing that Mr. Ford was a fugitive and that he fired a gun during the police chase in Grants. 3 R. 89-96. Ms. Goff recounted her relationship with Mr. Ford, their planning of the escape, and the events from the escape until their capture in Grants. This testimony established that Mr. Ford was a fugitive, that he knew Ms.

Goff stole the firearms, and that he knowingly possessed the Glock and had access to the .357 during the drive west.  E.g., id. at 172-73, 183, 185-86, 189, 192-93.

An uncharged act is admissible as *res gestae*—intrinsic evidence not subject to Federal Rule of Evidence 404(b)—if "it was inextricably intertwined with the charged crime such that a witness's testimony would have been confusing and incomplete without mention of the prior act."  United States v. Johnson, 42 F.3d 1312, 1316 (10th Cir. 1994) (alteration, citation, and internal quotation marks); see also United States v. Parker, 553 F.3d 1309, 1314 (10th Cir. 2009).  "Evidence of other crimes should not be suppressed when those facts come in as *res gestae*—as part and parcel of the proof of the offense charged in the indictment."  United States v. Kimball, 73 F.3d 269, 272 (10th Cir. 1995) (alterations and internal quotation marks omitted).

Mr. Ford argues that the *res gestae* doctrine does not apply because the government could have conveyed the operative facts without referring to the Kansas escape.  Aplt. Br. at 46-47.  According to Mr. Ford, his offer to stipulate that he was a convicted felon obviated any need to introduce evidence of the escape.  Id.; 1 R. 33.  But the offered stipulation covered only one element of one of the three charged crimes, being a felon in possession of firearms and ammunition.  The government still had to prove Mr. Ford's knowledge that the firearms were stolen, his possession of the firearms, and his status as a fugitive.

At the very least, the government needed evidence of the escape to show that Mr. Ford was a fugitive. Further, Ms. Goff was the best witness against Mr. Ford. She offered the memory and detail of an eyewitness and partner in crime. Her testimony about the planning of the escape was necessary to show how Mr. Ford knew the firearms were stolen.

The Kansas escape could not be separated from the charged crimes. Mr. Ford's flight began with the escape, which explained his need for weapons and the circumstances of his arrest just two and a half days later. In short, the evidence of the Kansas escape is undoubtedly *res gestae*—intrinsic evidence inextricably connected to the charged crimes.

Despite its relevance, *res gestae* evidence is nonetheless subject to Rule 403's balancing test: it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. Mr. Ford argues that "no probative facts . . . require an exploration of the inflammatory telling of a prison escape." Aplt. Br. at 48. As discussed above, the circumstances of the prison escape were highly relevant to the elements of the charged crimes. Mr. Ford has not shown how the evidence of his Kansas escape presented any danger of *unfair* prejudice, which "makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant *wholly apart* from its judgment as to his guilt or innocense [sic] of the crime charged." United States v. Tan, 254

F.3d 1204, 1211-12 (10th Cir. 2001) (citation and internal quotation marks omitted). Any prejudice suffered on account of the escape evidence is not unfair. Again, the evidence of the escape was necessary to show that Mr. Ford was a fugitive, an element of a charged crime.[1] Any additional color of the escape was closely related to Mr. Ford's guilt. The district court did not abuse its discretion in finding that the probative value was not substantially outweighed by the danger of unfair prejudice.

II.     Sentencing Enhancement

Mr. Ford argues that the district court erred in applying a sentencing enhancement for assaulting a law enforcement officer under U.S.S.G. § 3A1.2(c)(1). Aplt. Br. at 41-46. We review the district court's interpretation of the Guidelines de novo and any factual findings for clear error, "giving due deference to the district court's application of the guidelines to the facts." United States v. Wolfe, 435 F.3d 1289, 1295 (10th Cir. 2006) (citations and internal quotation marks omitted).

The six-level offense enhancement under § 3A1.2(c)(1) applies if, "in a manner creating a substantial risk of serious bodily injury, the defendant . . . knowing or having reasonable cause to believe that a person was a law

_____

[1] Although the district court hypothesized that it would still admit the evidence even if Mr. Ford were to stipulate that he was a fugitive, that the firearms were stolen, and that he knew they were stolen, we do not assess hypothetical rulings, despite Mr. Ford's wishes. See Aplt. Br. at 47-48.

enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom." U.S.S.G. § 3A1.2(c)(1) (2008). The district court found that Mr. Ford's firing the Glock near the police officers at the Grants apartment complex qualified him for the enhancement:

> [T]he evidence in this case supports all the necessary requirements for operation of this provision, regardless of whether Defendant Ford fired his weapon directly at the Grants police officer or fired at close range to create a diversion, because either way it constitutes an act which is intended to, and reasonably does, cause the victim to fear immediate bodily harm.

3 R. 290-91.

Mr. Ford challenges the enhancement on two grounds: (1) the court could not find that Mr. Ford created "a substantial risk of serious bodily injury" without any evidence that he fired in the officers' direction; and (2) the officers' fear of immediate bodily harm was irrelevant. Mr. Ford does not contest that he knew that the uniformed police officers were, in fact, police officers.

First, the district court had enough evidence to find that firing a gun 100 feet from officers in the middle of the night creates a substantial risk of serious bodily injury. Mr. Ford is correct that no evidence at trial demonstrated the direction of the gunshots. Nonetheless, he fired four rounds in close proximity to the police officers. In the context of a manhunt for Mr. Ford and his refusal to surrender, the district court could reasonably infer that Mr. Ford shot at the officers in order to escape. At least four circuits have found that a defendant

- 9 -

reaching for a gun during a police encounter creates a substantial risk of serious bodily harm. See United States v. Hill, 583 F.3d 1075, 1080 (8th Cir. 2009); United States v. Robinson, 537 F.3d 798, 802 (7th Cir. 2008); United States v. Lee, 199 F.3d 16, 20 (1st Cir. 1999); United States v. Bowie, 198 F.3d 905 (D.C. Cir. 1998). Admittedly, Mr. Ford was farther away from the officers than the defendants in those cases. But Mr. Ford's behavior was at least as risky as those defendants' because he actually discharged his weapon. Regardless of the direction of Mr. Ford's gunshots, their proximity to the police officers during a nighttime chase created a substantial risk of serious bodily injury.

Second, the officers' fear of immediate bodily harm relates to the assault element of the enhancement, not the substantial risk of serious bodily injury. "The guideline doesn't define assault, and exact requirements for assault vary from jurisdiction to jurisdiction." Robinson, 537 F.3d at 802. Nonetheless, Mr. Ford's conduct qualifies under even "the most demanding standard" of assault: conduct which places another in reasonable apprehension of receiving a battery with intent to "'cause apprehension' or actual 'bodily harm.'" Robinson, 537 F.3d at 802-03 (quoting 2 Wayne R. LaFave, Substantive Criminal Law § 16.3(b) (2d ed. 2003)). The evidence easily supports the district court's finding that the gunshots placed the officers in reasonable apprehension of being shot. And the court could reasonably infer that Mr. Ford intended to cause apprehension or actual harm: Mr. Ford's own appellate brief characterizes the gunshots as a

"diversionary act." Aplt. Br. at 42. A gunshot gives away the shooter's position, so it is a diversion only if it causes the officers to duck for cover. If the gunshots were diversionary, they were intended to cause apprehension. Whether diversionary or intended to harm the officers, the gunshots constituted an assault under any definition known to American law.

The district court did not err in finding that Mr. Ford's actions constituted an assault and created a substantial risk of serious bodily injury.

III.    Armed Career Criminal Act

Last, Mr. Ford challenges the district court's finding that one of his prior convictions qualifies as a predicate violent felony under the ACCA: his 1997 Kansas conviction for criminal discharge of a firearm at an occupied dwelling or occupied vehicle, Kan. Stat. Ann. § 21-4219(b) (repealed and recodified 2010). Mr. Ford does not dispute that two other prior convictions qualify as violent felonies. We review de novo whether prior convictions qualify as violent felonies. United States v. Scoville, 561 F.3d 1174, 1176 (10th Cir. 2009).

The ACCA mandates a minimum sentence of fifteen years' imprisonment for a person convicted of being a felon in possession of a firearm, and who has three prior convictions for violent felonies, serious drug offenses, or a combination of both. 18 U.S.C. § 924(e)(1). Under the ACCA, a "violent felony" is

> any crime punishable by imprisonment for a term exceeding one year

. . . that (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another . . . .

Id. § 924(e)(2)(B). To determine whether a prior conviction qualifies as a violent felony, the Supreme Court has mandated a "categorical approach." "Under this approach, we look only to the fact of conviction and the statutory definition of the prior offense, and do not generally consider the particular facts disclosed by the record of conviction." James v. United States, 550 U.S. 192, 202 (2007) (citations and internal quotations omitted). "'That is, we consider whether the *elements of the offense* are of the type that would justify its inclusion' within the ACCA, 'without inquiring into the specific conduct of this particular offender.'" United States v. West, 550 F.3d 952, 957 (10th Cir. 2008) (quoting James, 550 U.S. at 202).

In some cases, where the statute of conviction "proscribes conduct broader than that which would satisfy the ACCA's definition of a violent felony," a "modified categorical approach" is appropriate. West, 550 F.3d at 957-58. Under the modified categorical approach, "a federal court may then also look at the charging documents and documents of conviction to determine whether the defendant in a particular case was convicted of an offense that falls within the ACCA." Id. In the case of a guilty plea, the court may also examine "the terms of a plea agreement or transcript of colloquy between judge and defendant in

which the factual basis for the plea was confirmed by the defendant." Shepard v. United States, 544 U.S. 13, 26 (2005).

Mr. Ford argues that the district court improperly inquired into the particular conduct of his 1997 conviction to determine the statute of conviction, in violation of the categorical approach, and that the conviction does not qualify as a violent felony. Although Mr. Ford now claims "there is no contention that the statute of conviction is ambiguous," Aplt. Br. at 31, he argued otherwise before the district court. In his sentencing memorandum, he found the state court record of his guilty plea "ambiguous" because it described his crime as aggravated assault but cited Kan. Stat. Ann. § 21-4219. 1 R. 101-02. Indeed, the state court journal entry listed the crime as "Aggravated Assault, K.S.A. 21-4219, (severity Level 7, Person Felony)." Id. at 108. In light of Mr. Ford's ambiguity argument and because § 21-4219 seems to encompass conduct that might not qualify as a violent felony, the modified categorical approach was appropriate. Therefore, to resolve any ambiguity, the district court examined the charging documents and plea colloquy, as the modified categorical approach allows.

Despite the stray labeling of the crime as aggravated assault, the charging documents and plea colloquy demonstrate that Mr. Ford was convicted of criminal discharge of a firearm at an occupied building or vehicle. The criminal complaint and the plea colloquy both described the crime as "Criminal Discharge of a Firearm at an Occupied Vehicle (Severity Level 7, Person Felony)." Id. at 116,

161. In the plea colloquy, Mr. Ford confirmed the factual basis for the plea: "he fired two shots towards a vehicle" that was occupied. Id. at 161-62. In consulting these documents and using Mr. Ford's confirmation of the factual basis for his guilty plea, the district court followed the modified categorical approach as Shepard prescribes. Furthermore, all the available state court documents describe the crime as "severity level 7, person felony." Id. at 108, 116, 161. The only crime under § 21-4219 matching that description is criminal discharge of a firearm at an occupied building or vehicle.

With the precise statute of conviction in hand, we can now examine whether a Kansas conviction for criminal discharge of a firearm at an occupied building or vehicle is a violent felony. First, the crime is not among those enumerated in clause (ii) of the ACCA's violent felony definition: burglary, arson, extortion, or a crime involving the use of explosives. 18 U.S.C. § 924(e)(2)(B). Therefore, to qualify as a violent felony, it must fall under either clause (i), having "as an element the use, attempted use, or threatened use of physical force against the person of another," or clause (ii)'s residual clause, which includes crimes "otherwise involv[ing] conduct that presents a serious potential risk of physical injury to another." Id. The district court found that the crime qualifies as a violent felony under the residual clause. 3 R. 290.

The government argues that the crime qualifies as a violent felony under either clause, as it did before the district court. Aplee. Br. at 17, 24-27; 1 R. 125-

26. The crime does not qualify under clause (i), because it lacks "as an element the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i). Criminal discharge of a firearm at an occupied building or occupied vehicle "is the malicious, intentional and unauthorized discharge of a firearm at a dwelling, building, structure, motor vehicle, aircraft, watercraft, train, locomotive, railroad car, caboose, rail-mounted work equipment or rolling stock or other means of conveyance of persons or property in which there is a human being." Kan. Stat. Ann. § 21-4219(b). We have recognized that the Texas crime of knowingly discharging a firearm at or in the direction of a person is a violent felony under clause (i). United States v. Hernandez, 568 F.3d 827, 829-30 (10th Cir. 2009). Compared to the Texas crime in Hernandez, the requisite person in the Kansas crime of criminal discharge is one step removed. See Tex. Penal Code Ann. § 22.05(b)(1). The Kansas statute requires force against a building or vehicle, but not against the *person* inside, as clause (i) requires. The Fifth Circuit has distinguished between convictions for discharging a firearm at or in the direction of a *person* and convictions for discharging a firearm at or in the direction of an occupied building or vehicle. See United States v. Hernandez-Rodriguez, 467 F.3d 492, 495 (5th Cir. 2006); United States v. Alfaro, 408 F.3d 204, 208-09 (5th Cir. 2005) (Virginia crime of discharging a firearm within or at an occupied building in manner endangering the life of another person did not qualify under clause (i) because the required force

was not against the person of another).  Because the Kansas statute does not require the use of force, threatened use of force, or attempted use of force against the person of another, it does not qualify as a violent felony under clause (i).

The government makes a more compelling case that the crime qualifies under the residual clause.[2]  On its face, the residual clause includes crimes "otherwise involv[ing] conduct that presents a serious potential risk of physical injury to another."  18 U.S.C. § 924(e)(2)(B)(ii).  The Supreme Court has clarified that the clause encompasses only "crimes that are roughly similar, in kind as well as in degree of risk posed" to the crimes enumerated in the preceding clause: burglary, arson, extortion, and crimes involving the use of explosives. Begay v. United States, 553 U.S. 137, 143 (2008); see also United States v. Williams, 559 F.3d 1143, 1147 (10th Cir. 2009).  A crime is similar in kind to the enumerated crimes if it "involve[s] purposeful, violent, and aggressive conduct." Begay, 553 U.S. at 144-45 (internal quotation marks omitted); see also West, 550 F.3d at 965-68.

First, criminal discharge of a firearm at an occupied building or vehicle is at least as risky as burglary or arson.  As the government argues, "Burglary is dangerous because of the *possibility* that someone will be present when the crime

---

   [2]  Although Mr. Ford's reply brief offers a host of new arguments that the Kansas crime does not qualify as a violent felony under the residual clause, we decline to consider arguments not raised in his opening brief.  Bronson v. Swensen, 500 F.3d 1099, 1104 (10th Cir. 2007).

is committed," leading to a confrontation. Aplee. Br. at 29 (citing <u>James</u>, 550 U.S. at 203). Unlike burglary, criminal discharge requires a person's presence in the targeted building or vehicle. The person's presence increases the likelihood of at least a confrontation, if not a gunshot wound. The crime's risks are also similar to the risks attendant to arson. Arson directly damages a building, but indirectly endangers any person who might be inside. <u>See</u> Model Penal Code § 220.1(1), (4) (arson entails "start[ing] a fire or caus[ing] an explosion with the purpose of . . . destroying a building or occupied structure of another," though a structure is considered occupied "whether or not a person is actually present"). <u>But see</u> 3 LaFave, <u>Substantive Criminal Law</u> § 21.3(c) ("Today, most states provide more generally that 'buildings' or 'structures' or both are the subject matter of the crime of arson."). Again, the Kansas criminal discharge statute requires a person's presence, creating a greater risk than arson, which does not require a person's presence. The Kansas crime of criminal discharge proscribes conduct roughly similar in the degree of risk posed as two enumerated crimes.

The crime is also similar in kind to the enumerated crimes because it involves purposeful, violent, and aggressive conduct. First, the statute requires intentional conduct, which satisfies <u>Begay</u>'s requirement that the crime be purposeful. <u>West</u>, 550 F.3d at 970 ("<u>Begay</u> equates purposeful with deliberate or intentional." (citing <u>Begay</u>, 553 U.S. at 144-45)). Second, maliciously discharging a firearm at an occupied structure is violent and aggressive.

Undoubtedly, maliciously and intentionally shooting a building or car with people inside is "characterized [] by physical force, especially by . . . unjust or improper force," and therefore violent. Black's Law Dictionary 1570 (6th ed. 1990). It is unclear whether "aggressive" means anything different than "violent." United States v. Zuniga, 553 F.3d 1330, 1335 (10th Cir. 2009) ("We consider it unlikely that any conduct properly characterized as 'violent' could not also be characterized as 'aggressive.'"); see also David C. Holman, Violent Crimes and Known Associates: The Residual Clause of the Armed Career Criminal Act, 43 Conn. L. Rev. (forthcoming 2010) (manuscript at 19-20, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1556463). Nonetheless, the Kansas criminal discharge statute proscribes conduct which fulfills an approximate definition of "aggressive": "offensive and forceful and characterized by initiating hostilities or attacks." West, 550 F.3d at 969 (citations and internal quotation marks omitted). Because the Kansas crime of criminal discharge of a firearm at an occupied building or vehicle involves purposeful, violent, and aggressive conduct, and is at least as risky as two enumerated crimes, the crime qualifies as a violent felony under the ACCA's residual clause.

AFFIRMED.

- 18 -