NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 6, 2016
Decided December 12, 2016

**Before**

DIANE P. WOOD, *Chief Judge*

FRANK H. EASTERBROOK, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

No. 16-1615

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Appeal from the United States District Court for the Central District of Illinois. |
| *v.* | No. 15-CR-40040-001 |
| BOBBY JAMES MCCAW, *Defendant-Appellant.* | James E. Shadid, *Chief Judge.* |

**ORDER**

Late one night at a bar, a Rock Island police officer, acting on a tip from the bar owner, approached a patron, Bobby McCaw, and grabbed a firearm from his waistband. The rub was this: McCaw was a felon. Federal charges for possessing a firearm unlawfully as a felon followed under 18 U.S.C. § 922(g)(1). McCaw conditionally pleaded guilty and was sentenced to 37 months' imprisonment. He now challenges the

district court's denial of his motion to suppress the firearm. He urges that the police officer lacked reasonable suspicion for the stop-and-frisk, and thus that the officer unlawfully seized his firearm. We conclude that the district court was entitled on this record to uphold the officer's action and therefore affirm its judgment.

**I**

The key events of the night in question were described by Rock Island Police Officer Justin Holmes, the only witness to testify at McCaw's suppression hearing. Kyle Peters, the owner of a bar called the Daiquiri Factory, had texted Holmes, a member of Rock Island's downtown police unit, to let Holmes know that he was concerned that a patron might be carrying a gun. Peters, like most bar owners in downtown Rock Island, had the personal cell phone numbers of the officers in this unit. The nature of Holmes's relationship with Peters is not clear; at the suppression hearing Holmes said only that Peters "was … known" to him before that night. Holmes did not respond immediately to the text, and so Peters sent a bar employee to track him down.

After the bar employee delivered the message to Holmes, the latter went to the bar and met with Peters. Peters confirmed that he thought that a bar patron was armed and said that two other patrons had told him "that a [white] guy wearing a black basketball cap and a gray shirt had a handgun in his waistband." Peters did not offer any reason why these patrons knew this information. He just pointed at McCaw, who was on the dance floor. Holmes then walked toward McCaw.

As Holmes approached, McCaw turned away and toward the bar's counter. Holmes then "put [his] hands on the side of [McCaw's] hips … pretty much his waistband on the sides." Holmes said he touched McCaw in this manner to get his attention and, at the same time, to determine whether he had a gun tucked into his waistline. McCaw moved his right hand to the front of his waistband; Holmes followed his motion and felt a gun. Holmes pressed the gun against McCaw's body. Aided by two officers who had accompanied him to the bar, Holmes pushed McCaw to the ground, grabbed the gun, and handcuffed him. The gun, a Zastava 9-millimeter pistol, contained a fully-loaded magazine.

The government charged McCaw, who previously had been convicted of a felony, with knowingly possessing a firearm in violation of 18 U.S.C. § 922(g)(1). McCaw moved to suppress the firearm as unlawfully seized. His theory was that *Florida v. J.L.*, 529 U.S. 266, 271 (2000), required Holmes to corroborate the secondhand tips before conducting a *Terry* stop.

The district judge, adopting the findings and recommendation of a magistrate judge, denied McCaw's motion to suppress. The magistrate judge gave three reasons for concluding that Holmes had reasonable suspicion to pat down McCaw:

> 1) Kyle Peters personally relayed the information he received to Officer Holmes, thereby vouching for the credibility of the information he received; 2) two separate customers reported to Peters, who in turn reported to Officer Holmes, that a man fitting McCaw's description had a firearm in his waistband; 3) the allegation of illegally possessing a firearm in a crowded bar late at night concerned ongoing criminal activity presenting a risk to the patrons warranting quick action.

The magistrate judge thought that Holmes's ability to assess Peters's credibility and to hold him accountable if the tips were fabricated reduced the likelihood that the tips were false and supported a finding of reasonable suspicion. The judge bolstered these points by referring to this court's decision in *United States v. Robinson*, 537 F.3d 798 (7th Cir. 2008), in which we held that reasonable suspicion can be established by police corroboration of an anonymous secondhand tip reported by a known person and by an evaluation of this person's credibility. *Id.* at 801–02. Because reasonable suspicion existed for the frisk, the magistrate judge did not need to decide whether Holmes's confiscation of McCaw's firearm was an unlawful seizure. (There was no dispute that the frisk made the existence of the gun obvious.)

McCaw conditionally pleaded guilty to possessing a firearm unlawfully. He was sentenced to 37 months' imprisonment and three years' supervised release.

## II

We consider *de novo* the question whether Holmes had reasonable suspicion to frisk McCaw. *United States v. Hampton*, 585 F.3d 1033, 1038 (7th Cir. 2009). Police may conduct an investigatory stop without a warrant when the officer can identify "specific and articulable facts" suggesting that criminal activity may be occurring. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Reasonable suspicion "is a commonsense, nontechnical concept that deals with the factual and practical considerations of everyday life on which reasonable and prudent people, not legal technicians, act." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006) (internal citation and quotation marks omitted). In evaluating whether an officer had reasonable suspicion to conduct a *Terry* stop, we consider "the totality of the circumstances known to the officer at the time of stop." *Id.*

McCaw argues that the magistrate judge misapplied *Robinson* to this case because Holmes, unlike the officers in *Robinson*, did not corroborate the reliability of the bar owner's tip (much less anything about the unidentified customers) and therefore

did not have reasonable suspicion to frisk McCaw. We held in *Robinson* that secondhand tips can form the basis for reasonable suspicion if the party reporting the secondhand tips is credible *and* the police corroborate the tips. *Robinson*, 537 F.3d at 801–02. McCaw contends that Holmes lacked any basis to assess the reliability or source of the secondhand accusations that McCaw had a concealed gun. According to McCaw, Holmes therefore did not have reasonable suspicion to conduct a *Terry* stop even if he knew Peters and trusted him. McCaw also disputes the government's contention that the information relayed by Peters was sufficiently corroborated by two different patrons who reported that McCaw had a gun.

These are serious arguments, but we think that McCaw is reading too much into *Robinson*. That decision did not quantify how much corroboration of secondhand tips, if any, is necessary to establish reasonable suspicion. See *Robinson*, 537 F.3d at 801–02. In *Robinson*, the officers knew the people who had relayed information about the defendant, could assess their credibility, and could corroborate their information through other means such as their personal observations of the defendant, their knowledge of his criminal background, and the high-crime history of the area where he was found. *Id.* The record here is admittedly not as complete. Peters gave Holmes far less information to go on. Holmes did not know McCaw's criminal history, did not see any sign of a gun in McCaw's pants, and did not identify the bar as a site of regular criminal activity. Further, the fact that two patrons, not just one, ascribed a gun to McCaw did not necessarily corroborate Peters's report because the patrons could have colluded to provide a false report or obtained their information from an erroneous source. Nevertheless, as *Robinson* suggests, the reliability of a secondhand tip can be bolstered by an officer's familiarity with a source who he knows has no reason to prevaricate. See *id.* at 802.

On the other hand, facts similar to those we face here were present in *United States v. Hopes*, 286 F.3d 788 (5th Cir. 2002). There the Fifth Circuit held that police officers had reasonable suspicion to frisk a suspect for weapons in a halfway house based on the reliability of the manager's report of a secondhand tip. *Id.* at 790. The court noted that the house manager, with whom the officers "had dealt reliably with … many times," identified the suspect as possibly having a gun. *Id.* at 788, 790. In addition, the manager "could be held accountable if the tip proved to be fabricated." *Id.* at 790.

*Hopes* supports the conclusion that Holmes's familiarity with Peters and his opportunity to evaluate Peters's credibility face-to-face reasonably allowed him to assess the reliability of the secondhand tips. See *Adams v. Williams*, 407 U.S. 143, 147 (1972) (declaring that "a credible informant warn[ing] of a specific impending crime" can be sufficient to support a *Terry* stop). Furthermore, as a bar owner Peters had an

incentive to report only reliable tips. He would have had no reason to facilitate police harassment of his customers.

McCaw counters that *Hopes* is not consistent with the Supreme Court's opinion in *Florida v. J.L.*, *supra*. In *J.L.*, the Court ruled that an anonymous tip that does not reveal how the tipster knows of alleged illegal activity must be adequately corroborated by police to establish reasonable suspicion. *Id.* at 270. McCaw believes that *Hopes* "nullif[ied] *J.L.*" by crediting a known person's tip, which itself did no more than repeat uncorroborated secondhand information. McCaw sees this as indistinguishable from a more conventional uncorroborated tip of an anonymous person.

We already have explained why we are not persuaded by McCaw's challenge to *Hopes*, at least insofar as it is a broadside attack on secondhand information. In *Robinson*, we concluded that a police officer's personal interactions with a familiar person can lend reliability to his report of secondhand tips. *Robinson*, 537 F.3d at 802. *Robinson* emphasized that secondhand sources are not inevitably unaccountable: police officers can often trace false secondhand tips back to the persons who originated them. *Id.*

McCaw alternatively tries to distinguish *Hopes* by arguing that the officers there corroborated the anonymous secondhand tip, but Holmes did not. In *Hopes*, unlike McCaw's case, the suspect acted in an "alarmed" manner once officers approached him. The officers knew that the halfway house served former convicts in a dangerous neighborhood, and the halfway house manager reported that Hopes "had an altercation" with another resident before the officers arrived. See *Hopes*, 286 F.3d at 788, 790.

Even though Holmes did not corroborate the secondhand tips, as did the officers in *Hopes*, see *id.* at 790, there was enough other evidence to support reasonable suspicion for purposes of a *Terry* stop. That evidence included Peters's reporting of the secondhand tips; his incentive to report only accurate tips; the lack of any evidence indicating that the two customers who spoke to Peters had colluded; the late hour (1:45 a.m. or so); and the risk that there was an ongoing threat. We acknowledge that this is a close case, and that reasonable suspicion cannot be created by nothing more than an anonymous secondhand tip containing conclusory allegations of criminal activity and a physical description of a suspect's appearance. *J.L.*, 529 U.S. at 272. But if a tip is reported by a person whom the police know and regard as credible, it is possible (depending always on the surrounding facts) that they can establish reasonable suspicion. The critical point is the need to ensure that the police have a sufficient factual basis for concluding that crime may be afoot, and that the police, not tipsters, decide which tips are sufficiently reliable enough to support further action.

McCaw next asserts that the magistrate judge erred in concluding that the particular crime alleged in the tip, illegal gun possession, supported a finding that Holmes had reasonable suspicion to stop him. As McCaw points out, the idea that there is a so-called "firearm exception," under which a *Terry* stop is permissible based on bare allegations of illegal gun toting, was squarely rejected by the Supreme Court in *J.L.* 529 U.S. at 272. Such an exception would invite harassment and abuse of law-abiding gun owners. *Id.* at 272–73.

The problem with this argument is that the magistrate judge did not apply a firearm exception. Nothing in *J.L.* bars district courts from taking into account the nature of criminal activity alleged by tipsters into their assessments of reasonable suspicion. *Illegal* gun possession is just one form of potentially relevant criminal activity. In addition, McCaw's argument ignores Holmes's belief that McCaw was engaging in criminal activity at the bar. "[W]hen the police believe that a crime is in progress … action with fewer procedural checks in advance can be reasonable." *United States v. Wooden*, 551 F.3d 647, 650 (7th Cir. 2008).

### III

Because Holmes had reasonable suspicion to frisk McCaw, we do not consider whether Holmes "seized" McCaw when he grabbed McCaw's waistline. We AFFIRM the judgment of the district court.